IN THE

# SUPREME COURT

OF THE

## STATE OF INDIANA,

AT INDIANAPOLIS, NOVEMBER TERM, 1909, AND MAY AND
NOVEMBER TERMS, 1910, IN THE NINETY-FOURTH
YEAR OF THE STATE.

---

## INDIANAPOLIS NORTHERN TRACTION COMPANY ET AL. *v.* BRENNAN ET AL.

[No. 21,010.  Filed February 18, 1909.  Rehearing denied December
7, 1909.  Motion to retax costs sustained December 7, 1909.
Motion to strike out items of cost sustained
March 31, 1910.]

1. CONSTITUTIONAL LAW.—*Statutes.—Titles.—Mechanics' Liens.*—
The title to the mechanics' lien act of 1883 (Acts 1883 p. 140)
reading: "An act concerning liens of mechanics, laborers, and
materialmen," does not cover railroad contractors, and therefore
section six of the amendatory act of 1889 (Acts 1889 p. 257,
§8305 Burns 1908) if construed to provide for liens for contract-
ors would be unconstitutional.  pp. 14, 19, 48.

2. STATUTES.— *Extending by Construction.— Mechanics' Liens.*—
Courts have no power to extend a statute so as to include per-
sons who do not fairly come within the scope of its title.  p. 17.

3. STATUTES.— *Construction.—Mechanics' Liens.*—Mechanics' lien
statutes being remedial but in derogation of the common law will
be construed liberally as to their remedies, but strictly as to the
persons entitled to liens.  p. 17.

4. STATUTES.— *Words.— Construction.*—Words used in a statute
will ordinarily be given their common meaning.  p. 18.

5. WORDS AND PHRASES.— *"Laborers."— Mechanics' Liens.*— The
word "laborers," as used in the title to the mechanics' lien act of
1883 (Acts 1883 p. 140), imports persons who do physical labor
for wages, and does not include contractors.  p. 18.

6. CONSTITUTIONAL LAW.— *Title.— Statutes.— Amendments. —Me-
chanics' Liens.*—The mechanics' lien act of 1899 (Acts 1899 p.
569, §8295 Burns 1908), amending the mechanics' lien act of

1883 (Acts 1883 p. 140), but not amending the title thereto, is invalid so far as it purports to give to contractors a lien, since they were not included in the title to such act of 1883.  p. 22.

7.   APPEAL.—*Weighing Evidence.*—The Supreme Court will not weigh conflicting oral evidence.  pp. 22, 25.

8.   CONTRACTS.—*Conditions Precedent.—Performance.—Damages.— Railroads.*—An interurban railroad company contracting to have its track in a certain condition so that contractors for its overhead work could perform their contracts, is liable for its failure to have its track in such condition, thereby delaying and hindering such contractors.  p. 24.

9.   APPEAL.—*Affirmance.—Weighing Evidence.*—Where there is evidence tending to support the judgment of the trial court, such judgment will not be disturbed on appeal.  p. 25.

10.  CONTRACTS.—*Railroads.—Engineers.—Conclusive Decision of.*— A contract providing that the chief engineer of an interurban railroad company shall decide conclusively the character and classification of excavations to be made by a contractor does not prevent a resort to the courts by such contractor to remedy any wrong done by such engineer, the decision of the engineer being *prima facie* correct and the burden of overthrowing it because of fraud or mistake being upon the one assailing it.  p. 32.

11.  CONTRACTS.— *Decisions as to Construction of.— Engineers.— Railroads.—Courts.*—The decision of an umpire as to the construction of a contract is not binding upon the courts.  p. 32.

12.  CONTRACTS.—*Construction.*—Contracts must be given a reasonable construction.  p. 33.

13.  CONTRACTS.— *Railroads.— Excavations.— Classification of Materials of.—"Plowed."*—A railroad excavation contract providing that "loose rock shall comprise:  [1] hard shale or soapstone lying in its original or stratified position, [2] coarse boulders in gravel, [3] cemented gravel, [4] hardpan, or [5] any other material requiring, in the judgment of the chief engineer of the company, the use of the pick and bar, or [6] which cannot be plowed with a strong ten-inch grading plow, well handled, and drawn by six good mules or horses. * * * The plowing test shall apply to all the materials named herein, and that only such material is entirely loose rock which * * * it is impracticable to plow at all" with such plow, imports that such plow test shall apply to the materials included in specification [6], and not to the materials specifically set out theretofore, the word "plowed" being used in its ordinary sense and not including the "rooting up" of the substance in an unusual manner.  p. 33.

14.  APPEAL.—*Presentation of Question.—Method of Computation.— Evidence.—Decision.*—Where no special findings were made and merely the total amount of recovery was given in an action for a

Indianapolis, etc., Traction Co. *v.* Brennan—174 Ind. 1.

sum due for railroad construction, and for damages, the method of computation of the size of excavations adopted by the trial court is not properly presented on appeal. p. 40.

15. JURY.—*Demand for.*—*Waiver.*—*Mechanics' Liens.*—A defendant, by demurring to plaintiff's complaint and by objecting to the evidence offered to establish the mechanic's lien prayed for, waives his right to demand a jury trial, there being no objection to the submission of the cause to the court for trial. *Shaw* v. *Kent*, 11 Ind. 80, overruled. pp. 42, 43, 44, 48.

16. PLEADING.—*Complaint.*—*Sufficiency on Demurrer.*—A complaint stating facts sufficient to entitle the plaintiff to any relief is good on demurrer. p. 43.

17. APPEAL.—*Rehearing.*—*Questions Presentable.*—Failure to present a question on the first hearing in the Supreme Court is a waiver of the right to present it on a rehearing, but the court may, in its discretion, consider such question. p. 44.

18. TRIAL.—*Parties.*—*Assertion of Rights.*—*Demand for Jury.*—*New Trial.*—Parties to a suit to enforce a mechanic's lien are bound to assert their right to a jury trial, if they deem themselves entitled thereto, and to make the overruling of a motion therefor a reason for a new trial, or such right will be deemed waived. p. 47.

19. CONSTITUTIONAL LAW.—*Statutes.*—*Titles.*—*Mechanics' Liens.*—Neither the title to, nor the purview of, the mechanics' lien act of 1873 (Acts 1873 p. 187, §§5301-5303 R. S. 1881) gives a railroad contractor a lien for the amount due to him. p. 49.

20. COSTS.—*Appeal.*—*Supreme Court.*—*Discretionary Power.*—The Supreme Court has a discretionary power to apportion the costs on appeal equitably. p. 52.

21. COSTS.—*Appeal.*—*Reversal in Part.*—Where an appeal involved a personal judgment against an interurban railroad company for a sum due for the construction of a part of its road, and also a decree for the foreclosure of a mechanic's lien for such sum, the costs of the bill of exceptions, on a reversal of the decree for the lien and an affirmance of the judgment, should be borne by the company, such bill not being necessary to the consideration of the decree establishing the lien. p. 53.

22. JUDGMENT.—*Motions to Modify.*—*Excessive Relief.*—Where a decree for the foreclosure of a lien is wrongfully entered in addition to a personal judgment for the amount of recovery, the remedy is by a motion to modify. p. 53.

23. CONSTITUTIONAL LAW.—*Statutes.*—*Titles.*—*Bonding or Surety Companies.*—*Bonds.*—*Taxation of Costs of.*—The title to the act of 1901 (Acts 1901 p. 63) reading: "An act for the incorporation of bonding or surety companies, defining their powers, prescribing the duties of certain officers in connection therewith, authorizing

the acceptance of bonds made by an incorporated company, providing penalties for the violation of this act, and declaring an emergency," does not cover a provision in the purview of such act that the party entitled to recover costs in a proceeding may include the sum paid to any such company for the execution of a bond for such party, and no such costs can be taxed. p. 54.

From Howard Circuit Court; *J. F. Elliott,* Judge.

Suit by James J. Brennan and another against the Indianapolis Northern Traction Company and others. From a decree for plaintiffs and for certain cross-complainants, defendant company and others appeal. *Reversed in part. Affirmed in part.*

*J. A. Van Osdol, Blacklidge, Wolf & Barnes, Miller, Shirley & Miller* and *William L. Taylor,* for appellants.

*L. C. Walker, Bell & Purdum, Smith, Duncan Hornbrook & Smith, King, Tracy, Chapman & Welles, Frank C. Cutter* and *A. C. Harris,* for appellees.

JORDAN, C. J.—Appellees James J. Brennan and Arthur B. Hogue, as plaintiffs below, commenced this suit to recover a money judgment and to enforce a lien against appellant Indianapolis Northern Traction Company which is alleged to be a railroad company duly incorporated and organized under the laws of this State for the purpose of constructing and operating an electric railroad extending from the city of Indianapolis, through several intervening counties, to the city of Peru, with certain lateral lines extending from the city of Kokomo, Howard county, to the city of Logansport, Cass county, and also for constructing and operating other electric traction lines from the city of Anderson, and embracing a series of other cities and towns, as mentioned in the amended complaint filed by the aforesaid parties.

The complaint is based on a working contract executed by the Indianapolis Northern Traction Company and the firm of Brennan & Nelson, contractors. By this contract that firm agreed to install and to complete what is denom-

inated as the over-head construction of the railroad in question along the portion of appellant's line that extends from the city of Tipton to the city of Logansport. This work consists of placing poles, trolley wires and also other wires for the proper transmission of electricity as a motive power, together with all the equipment connected therewith. At the time this suit was commenced, Brennan & Hogue had acquired and succeeded to whatever rights the firm of Brennan & Nelson originally had under the contract in question. Brennan & Hogue alleged that there was due to them on the contract in suit $15,000. This included certain extra work and labor mentioned in the complaint, and they demanded judgment for that amount, together with a foreclosure of a mechanic's lien, notice of which having previously been filed, as required by law, in the recorder's office of the several counties through which the road extended. Other persons, in addition to appellant railroad company, were made codefendants to answer in respect to their several interests in the lien against the railroad property involved. Among these parties was appellee Jacob N. Bick. He appeared to the suit, and on September 16, 1904, filed a cross-complaint, consisting of three paragraphs, to which cross-complaint plaintiffs Brennan & Hogue and all of Bick's codefendants were made cross-defendants. Bick was the contractor for the construction of the grade of the railroad in question under two working contracts with the Indianapolis Northern Traction Company. One of these contracts bore date of December 6, 1902, and included that part of the road's grade designated as section 1, station 20, to section 16, station 980. This part extended from a point near the city of Kokomo to the city of Peru. The other contract, known as number two, bore date of March 1, 1903, and covered that part of the road between points mentioned as section station 1,100 and section station 1,740, all in Hamilton county, Indiana. Bick, by his cross-complaint, sought to recover a remainder alleged to be due to him from

appellant Indianapolis Northern Traction Company, under contract for the construction of the railroad bridge, as well as other damages alleged to have been sustained by him. He also sought to foreclose a mechanic's lien to secure the payment of the amount due to him.

It will be noted that the suit was in two branches—one branch based on the complaint of Brennan & Hogue and the other founded upon the cross-complaint of Bick. Under the issues joined the two branches were tried together. The cause was submitted to the court for trial and a general finding was made, there being no request by either party for a special finding. Upon evidence given in the cause, the court found that appellees Brennan & Hogue should recover upon their complaint against the Indianapolis Northern Traction Company the sum of $5,044.88, and further found that they were entitled to be allowed the sum of $1,200 for attorney's fees—in the aggregate $6,244.88, and that this amount was a lien upon the property described in the complaint, and a foreclosure of the lien was decreed. On the issues joined upon the cross-complaint of appellee Bick, the court found that said cross-complainant was entitled to recover from the Indianapolis Northern Traction Company the sum of $57,969.02, together with attorneys' fees, making a total amount of $61,969.02. Of the total amount awarded in favor of Bick, the court found that he was entitled to hold and enfroce a lien to the amount of only $52,539.34 upon the property described in the cross-complaint, and that he was entitled to a foreclosure in payment of said sum of $52,539.34, but denied his right to a lien upon the remainder, $9,429.68. Over a separate motion for a new trial by the Indianapolis Northern Traction Company, wherein it assigned statutory grounds and other reasons, the court entered its decree against said traction company in favor of the respective appellees. To review this decree appellants prosecute this appeal. The Indianapolis Northern Traction

Company, separate and apart from its codefendants, assigns errors.

The two branches of the case herein may be said to present two questions in common with each other: (1) Whether, under the statute of the State of Indiana, appellees Brennan & Hogue and Bick could acquire any lien upon appellant company's electric railroad. (2) Whether we will yield to the contention of counsel for said appellant, and weigh conflicting evidence given at the trial upon the issues tendered in each branch of the case.

We here state, in substance, what is averred in the three paragraphs of the amended complaint of Brennan & Hogue on which their branch of the case was tried. The first paragraph discloses that, in order for said contractors successfully to prosecute the work undertaken by them, it was necessary that the railroad company should have all poles and overhead material on hand ready for use and the grade prepared not later than March, 1903; that immediately after entering upon the performance of their contract these plaintiffs arranged to begin work on or before the aforesaid month of March, and so notified the company; that the latter did not however have its poles, grades and other material in condition for said contractors to proceed until about the first of May, 1903, at which time they were notified to have their men at work on the job; that although said contractors complied promptly with the request of the company to begin work, they were constantly impeded, hindered and interfered with in the performance of their contract by reason of the failure of the company to furnish the necessary poles and materials at the storehouse agreed upon, and by reason of the facts that the grade was not finished and that the company's engineer capriciously required the work to be reconstructed after it had been completed in a proper manner; that because of the incomplete condition of the grade, absence of stakes, and other alleged failures on the part of the traction company to put its property in condi-

tion for the work of overhead construction, these contractors were put to unreasonable and unnecessary expense in breaking camp from time to time and moving from one place to another in order to complete the work in fragments, instead of completing it as one continuous line; that the company's engineer in charge of the work "fraudulently" failed to give the contractors estimates on the amount of work performed at the time prescribed by the contract, and that he did so with the intention thereby of compelling these contractors to abandon the work; that finally, on November 27, 1903, the company served notice on said contractors that on December 1, 1903, it would take possession of the uncompleted portion of the work, because the contractors had been negligent in carrying the work forward, and that on said last-mentioned date the company did take charge of and complete the work, excluding the contractors from the performance thereof; that from time to time it developed that there was much of the construction required which was not included under the terms of the contract, for which said contractors would be entitled to extra compensation; that, in view of these conditions, and in view of the necessity of promptly performing said extra work, it was mutually agreed that the performance of the working contract, requiring all orders for such extra work to be reduced to writing, and requiring the contractors to give notice in writing of the amount of extra compensation claimed, should be mutually waived, and that, in lieu thereof, the engineer in charge would from time to time give oral directions concerning such extra work, which the contractors should thereupon proceed to do, and that the company would pay a fair and reasonable price for the performance of such work; that, under the contract as modified, the engineer required much extra work to be done, and required statements of its value to be rendered from time to time to the traction company; that the entire value of the work done under the contract amounted to $11,786, of which payment to the

amount of $5,583 had been made before the commencement
of the suit; that the extra work done, for which no com-
pensation had been received, was of the value of $2,048.60,
and that said company had refused to pay any part of the
balance due; that notice to hold a mechanic's lien upon the
property was filed in the offices of the recorders of Howard,
Tipton and Cass counties within the time prescribed by the
statute.

An additional amount of $5,000 damages is shown as re-
sulting from the delay of the company in failing to have
the material on hand, etc., whereby the cost of the work ac-
tually done, in the completion of the overhead construction,
was increased to the latter amount. Judgment against the
Indianapolis Northern Traction Company was demanded in
the sum of $15,000, including attorneys' fees, and a fore-
closure of the lien in question.

The second paragraph of the complaint alleges substan-
tially the same facts as the first, but does not count upon a
mechanic's lien.

The third paragraph is based upon a *quantum meruit*,
alleging the performance of certain work and the construc-
tion of the overhead system, as shown by a bill of particulars
filed, and that there is still due to the plaintiffs for this work
$9,000, in addition to $2,000 attorneys' fees. A foreclosure
of the lien against the property is prayed for, as in the first
paragraph of the complaint.

The three paragraphs of the cross-complaint of Bick may
be summarized as follows: The first is based on the working
contract of December 6, 1902. Among other things, it is
averred that it was stipulated in the contract that the work
in question should commence on or before the first week in
March, 1903, and should be completed on or before the first
day of July of the same year. It was provided that if there
should be any delay on account of the failure of the traction
company to procure all necessary rights of way, said con-
tractor should have a reasonable time to complete the work

after the necessary rights of way had been acquired. It was alleged that said contractor was put in possession of said rights of way, that he commenced his work in season and carried it forward vigorously until its completion on January 1, 1904; that by reason of the neglect and default of the company in procuring the rights of way and in failing to put said contractor in possession of portions thereof until the middle of November, 1903, he was put to additional expense in having to use picks, shovels and dynamite to explode and excavate large quantities of frozen earth; that it became necessary to and he did clear twenty-five and twenty-seven one-hundredths acres of land, which work was worth $20 an acre; that he grubbed twenty-two and thirty one-hundredths acres, which was reasonably worth $35 an acre, and that it became necessary for him to use, and he did use, as authorized under the contract, certain quantities of tile of different sizes, all of which facts are duly set forth in the pleading; that he performed certain other extra work, known as the "force account," the aggregate value of which was $2,051.64, and it was necessary in the completion of the work to excavate material, classified by said contract as earth, to the amount of 134,341 cubic yards; that the "overhaul" necessary to be done, and which was done by him, amounted to 1,867,543 cubic yards, aggregating, at the contract price, the sum of $18,675.43; that he excavated 16,-616.3 cubic yards of material, which was classified as loose rock under the contract, the excavation of which was worth $1 a cubic yard, and he excavated 75,168 cubic yards, classified under said contract as loose rock, which was worth seventy cents a cubic yard; that the total sum accruing to him by reason of doing said work is $122,851.13, a part of which has been paid, leaving a balance of $61,513.28 due and unpaid; that the partial estimates, which were made from time to time during the progress of the work as provided by the contract, were grossly erroneous, in this, that the overhaul was estimated at only 1,347,380 cubic yards, for which

the contractor was allowed only $13,473.08; that the chief engineer of the traction company, during the progress of the work, was a stockholder in and an officer and employe of said company; that said engineer, in determining what was "overhaul," within the meaning of the tests and terms agreed upon in the contract, acted erroneously, fraudulently, arbitrarily, and with great abuse of judgment and discretion; that such engineer failed and neglected "in determining the overhaul" to apply the test prescribed by the contract, but that he arbitrarily, purposely, and with intent to injure said contractor, failed to classify as overhaul that which clearly was such by the terms of the contract; that he grossly erred and underestimated the quantity of overhaul made by said contractor; that he also neglected and refused carefully and honestly to estimate the loose rock excavated; that he purposely and wrongfully estimated the quantity of loose rock to be only 5,505 cubic yards, and allowed only thirty-five cents a cubic yard for excavating said rock. The provisions of the contract under which it is alleged that said contractor was entitled to the classification insisted on by him, are set forth and embodied in the complaint. It is further shown that the classification made by said engineer, as well as the computation of overhaul, was so made over the protest of said contractor, and that because of the bias, interest, ignorance, fraud, mistake and dishonesty of the engineer, as charged, such classification and estimates are void, and in no manner binding upon the contractor.

It is further shown that notice of said cross-complainant's intention to hold a lien upon the railroad in the several counties mentioned was filed in the manner and at the places prescribed by the statute. The prayer is for judgment against the traction company in the sum of $75,000 and a foreclosure of the lien.

The second paragraph of the cross-complaint relies upon the same contract and is similar to the first, except that it

is alleged therein that part of the contract is reduced to writing, and that part remained in parol.

The third paragraph of the cross-complaint recites the history of the traction company's organization substantially as in the other paragraphs, but is founded upon the contract of March 1, 1903, which is denominated contract number two. This contract embraces certain grade construction of appellant's road in Hamilton county, and it is averred that by its terms the cross-complainant, as contractor, agreed to furnish all the materials, except that used for bridges, and to prepare the grade for the construction; that he was to receive twenty cents a cubic yard for all earth excavated between certain stations therein mentioned, and thirty-two and one-half cents for the earth excavated between certain other stations therein named; that, in case it became necessary to haul the earth or other material excavated more than five hundred feet, then said contractor was to receive the additional sum of one cent a cubic yard for each one hundred feet such material was hauled in excess of five hundred feet; that he was to receive $20 an acre for grubbing, and that for all tile he was to receive the prices therein named; that it was stipulated in this contract that the work was to be begun within fifteen days from the date of notice of the chief engineer, and was to be completed on or before July 1, 1903, provided, that if there was any delay due to the failure of the traction company to procure necessary rights of way in time for the performance of the work the period should be extended a reasonable time after such rights of way were procured. It is further alleged that such contractor commenced his work at the proper time, and prosecuted it vigorously, but, by reason of the numerous delays by the traction company, he was unable to complete such work before January 1, 1904, at which time such work was completed and accepted by the company; that in the necessary completion thereof he was required to, and did,

clear and grub a certain amount of land therein mentioned, used certain quantities of tile of various sizes, and was compelled to perform certain extra amounts of work in excavating the pole lines for the traction company, which work was worth $934; that he excavated 57,959 cubic yards of material, classified as earth, at the price of thirty-two and one-half cents a cubic yard, and 61,626 cubic yards of earth at twenty cents a cubic yard; that the amount of overhaul necessary to be done was 311,904 cubic yards, which aggregated, under the contract, $3,119; that he performed certain other extra work at the Atlanta overhead station, amounting to 1,722 cubic yards at twenty cents a cubic yard, and that he performed other extra work, known as "force account," to the amount of $92.30; that he performed all of the conditions of the contract upon his part; that the total value of the work done amounted to $35,901.18, upon which he has been paid $26,744.15, leaving a balance of $9,157.03 due and unpaid; that the partial estimates made from time to time, as provided by the contract, were erroneous in this, that he was allowed only $2,252 for the overhaul, estimated at 225,222 cubic yards; that the estimates made were further wrong, in that the engineer of the company estimated the earth excavated at 56,581 cubic yards at thirty-one and one-half cents a cubic yard, and 47,783 cubic yards at twenty cents a cubic yard, instead of the true amount as hereinbefore alleged. It is alleged that the engineer was a stockholder, officer and employe of the traction company, and that all of the errors of which the cross-complainant complains were the result of gross negligence, fraud and abuse of discretion; that these estimates and classifications were made over the protest of such contractor, and are not binding upon him, by reason of their fraudulent character as therein alleged. It is shown that notice of the cross-complainant's intention to hold the statutory lien was duly filed and recorded, as provided by law. The

prayer is for judgment for $10,000 and attorneys' fees and for a foreclosure of the lien.

Among the first propositions advanced by appellants' counsel for a reversal of the judgment is that section twelve of the mechanics' lien act of 1883 (Acts 1883 p. 140) as amended (Acts 1889 p. 257, §6, §8305 Burns 1908), so far as it attempts to create a lien against railroad property in favor of contractors who neither furnish material nor personally perform any labor, is, under article 4, §19, of the state Constitution, invalid, because contractors cannot be said to be embraced in the title of the mechanics' lien act of 1883, *supra,* which is as follows:

"An act concerning liens of mechanics, laborers, and materialmen."

Section twelve of said act, as originally enacted, declares that "all persons, who by contract with any railroad corporation * * * shall perform labor or furnish material for any such corporation, * * * in the way of grading, building embankments, or making excavations for the track of any such railroad corporation, or who shall build or repair bridges or trestle-work for any such railroad corporation, or the lessee thereof, shall have a lien," etc. Said section appears to have been twice amended, once in 1885 (Acts 1885 p. 236) and again in 1889 (Acts 1889 p. 257, §6, §8305 Burns 1908), but there has been no amendment to the title of the statute, and whatever attempts the legislature may have made by subsequent amendments to extend or broaden the provisions of the act, as it was originally enacted, appear to have been made without any change of the original title. This section, as it appears in the amendatory act of 1889 (§8305, *supra*), upon which appellees seek to base their right to a lien upon the railroad property in question, reads as follows: "All persons who shall perform work or labor in the way of grading, building embankments, making excavations for the track, building bridges,

trestle-work, works of masonry, fencing or any other structure, or who shall perform work of any kind in the construction or repair of any railroad, or part thereof, in this State; and all persons who shall furnish any material for any such bridge, trestle-work, work of masonry, fence or other structure, or who shall furnish any material for use in the construction or repair of any railroad, or part thereof, in this State, whether such work or labor be performed or such material furnished in the pursuance of a contract with the railroad corporation, building, repairing or owning such railroad, or whether such work or labor be performed or material furnished, in pursuance of a contract with any person * * * engaged as * * * contractor, subcontractor or agent * * * may have a lien,'' etc.

The question as raised and presented by counsel for appellants is that the title of the mechanics' lien statute of 1883 is not broad enough, under the constitutional provision to which we have referred, to authorize thereunder legislation providing a lien in favor of ''contractors'' who do not personally perform the labor in the construction of a railroad, and that therefore the provisions of §8305, *supra*, must be limited to persons who themselves actually perform such labor, and that the term ''laborers,'' as employed in the title, cannot be held to extend to or embrace contractors who undertake the work of building or constructing a railroad. This question, so far as we are able to discover, appears to be raised and presented for the first time in this appeal. Each contract in this case, executed by the railroad company and appellee Bick, reads, in part, as follows:

''This agreement made and concluded * * * by and between J. N. Bick, of the first party, hereinafter called 'contractor,' and the Indianapolis Northern Traction Company, of the second party, hereafter called 'company,' bears witness as follows: First. The contractor, in consideration of the prices hereinafter agreed to be paid to him by the company, hereby undertakes and agrees to do and perform to the satis-

faction and acceptance of the chief engineer of the company, all of the grubbing, clearing, grading and to furnish all materials and to do and supply all other things requisite and necessary to complete the road-bed, with the exception of the permanent bridges and masonry, and prepare the same ready for receiving the superstructure upon that portion of the railroad known and designated as section * * * . Such work shall be finished in the best and most workmanlike manner and shall be constructed of the best materials of their several kinds, and all in conformity with the annexed specifications and conditions and proposals, which are hereby expressly made a part of this contract.''

The contract for the overhead construction of appellant company's road, as entered into between it and Brennan & Nelson, is as follows:

"This agreement made December 15, 1902, between the Indianapolis Northern Traction Company, hereinafter referred to as the 'company,' and Brennan & Nelson, hereinafter referred to as 'contractor,' witnesseth: The contractor does hereby covenant, promise and agree, for the consideration hereinafter named, to do all work, deliver all materials for erecting, complete in place, the work described, all in accordance with the specifications and drawings referred to herein and hereunto attached, in a proper, thorough and workmanlike manner and under the direction and to the satisfaction of the company's engineer.''

As shown by these contracts and the evidence in this case, appellees undertook to perform the construction of the parts of appellant company's railroad as provided by the contracts, not merely as laborers, but wholly as contractors, the work of such construction being let to them by the railroad company under the aforesaid contracts, such work being performed by persons whom appellees engaged as their employes to carry out their contracts.

An examination of the title in controversy discloses that it indicates that the object of the legislation proposed by the legislature is to deal only with liens pertaining to three

classes of persons, viz., "mechanics, laborers and materialmen." The title is expressed in explicit language, and it is quite evident that thereby it was the intention of the legislature to limit the proposed legislation thereunder to the liens of mechanics, laborers and materialmen. It so explicitly expresses the whole purpose of the legislation as to bring it within the maxim that the expression of one thing excludes all others. Under the circumstances, therefore, it is not within the province of a court to extend the legislation under such a title so as to embrace liens in favor of persons who do not fairly come within the meaning or scope of the title in controversy. *Mewherter* v. *Price* (1858), 11 Ind. 199; *Voss* v. *Waterloo Water Co.* (1904), 163 Ind. 69; *State, ex rel.,* v. *Board, etc.* (1906), 166 Ind. 162, 198; *State* v. *Dorsey* (1906), 167 Ind. 199.

In considering the question as to whether appellees' right to the liens here involved can be upheld under §8305, *supra,* we must first determine whether the legislature, in enacting the mechanics' lien law of 1883, *supra,* intended to extend its protection to contractors of the class to which appellees belong, or in other words, to persons who, under their contracts, furnish the labor of others in carrying out the work which they have contracted to do. The act in question being remedial in its character, should, as to all persons who come within its provisions, be accorded a liberal construction. But as it is in derogation of the common law, the liberal rule of construction does not apply in determining what persons come within the statute, but in respect to this question a court must indulge in a strict construction, for as said in the case of *Morris* v. *Louisville, etc., R. Co.* (1890), 123 Ind. 489: "Courts must construe and enforce the statute as a remedial one, but they cannot extend it to meet cases not within its scope, however meritorious they may be." See 2 Jones, Liens (2d ed.) §1554; Phillips, Mechanics' Liens (3d ed.) §§18, 19; Boisot, Me-

Vol. 174—2

chanics' Liens §§34, 37; *Cincinnati, etc., Railroad* v. *Shera* (1905), 36 Ind. App. 315, and authorities cited.

The next inquiry is, What is meant by the term "laborer," as employed in the title of the act? While this term is found in the title, nevertheless its meaning must be determined by the same rule which would be applicable if it were contained in the body of the statute. It is a well-settled canon of construction in this State that words or terms employed in an act of the legislature will be interpreted or construed in their plain, popular and usual meaning, unless such a construction will manifestly result to defeat the intent of the legislature. *Massey* v. *Dunlap* (1896), 146 Ind. 350.

It is evident that if we are guided by this well-recognized rule in the interpretation of the term "laborers," as used in the title, we will not, in so doing, defeat the legislative intent. It certainly may be asserted, as there is nothing appearing to the contrary, that the word "laborers" was used by the legislature in the common meaning usually accorded to it by lexicographers, as well as by the courts in their interpretation of such term contained in statutes of similar import as the one here involved. The policy of the legislation enacted under the title in question, was to protect a class of persons commonly known as "mechanics" and "laborers," who, generally speaking, perform the labor which they have contracted to do, or, in other words, persons who, by the force of their circumstances, depend for their support on the wages or compensation received by them for their labor, and for that reason, among others, the legislature deemed it proper to award to them a lien to secure the payment of the wages or compensation earned by them. It is clear that by the term "laborers" in the title of this act the legislature did not intend to extend the legislation so as to include a class of persons known as "contractors," who usually carry into effect the work which they have undertaken, not by their own labor, but by

means of the services of employes from whose labor they expect to secure a profit. In 2 Jones, Liens (2d ed.) §1630, the author says: "The right conferred by a lien in favor of laborers is personal, and cannot be availed of by one who furnishes labor." In respect to the definition of the term "laborer," see Century Dict. p. 3318, and 2 Bouvier's Law Dict. p. 99. That statutes conferring lien rights upon laborers cannot be held to apply to or include contractors, such as appellees in this case appear to be, is well sustained by the following cases: *Raynes* v. *Kokomo Ladder, etc., Co.* (1899), 153 Ind. 315; *McElwaine* v. *Hosey* (1893), 135 Ind. 481; *Anderson Driving Park Assn.* v. *Thompson* (1897), 18 Ind. App. 458; *Little Rock, etc., R. Co.* v. *Spencer* (1898), 65 Ark. 183, 47 S. W. 196, 42 L. R. A. 334; *Dano* v. *M., etc., R. Co.* (1872), 27 Ark. 564, 567; *Martin* v. *Michigan, etc., R. Co.* (1886), 62 Mich. 458, 29 N. W. 40; *Chicago, etc., R. Co.* v. *Sturgis* (1880), 44 Mich. 538, 7 N. W. 213; *Heebner* v. *Chave* (1847), 5 Pa. St. 115; *Seider's Appeal* (1863), 46 Pa. St. 57; *Wentroth's Appeal* (1876), 82 Pa. St. 469; *Pennsylvania, etc., R. Co.* v. *Leuffer* (1877), 84 Pa. St. 168, 24 Am. Rep. 189; *Mann* v. *Burt* (1886), 35 Kan. 10, 11, 10 Pac. 95; *Adams* v. *Goodrich* (1875), 55 Ga. 233; *State* v. *Mills* (1882), 55 Wis. 229, 233, 12 N. W. 359; *Tod* v. *Kentucky Union R. Co.* (1892), 52 Fed. 241, 3 C. C. A. 60, 18 L. R. A. 305; *Rogers* v. *Dexter, etc., R. Co.* (1893), 85 Me. 372, 27 Atl. 257, 21 L. R. A. 528; *Vane* v. *Newcombe* (1889), 132 U. S. 220, 10 Sup. Ct. 60, 33 L. Ed. 310; *Henderson* v. *Nott* (1893), 36 Neb. 154, 54 N. W. 87, 38 Am. St. 720; *Aikin* v. *Wasson* (1862), 24 N. Y. 482; *Wakefield* v. *Fargo* (1882), 90 N. Y. 213; *Lang* v. *Simmons* (1885), 64 Wis. 525, 25 N. W. 650; *Frick Co.* v. *Norfolk, etc., R. Co.* (1898), 86 Fed. 725, 32 C. C. A. 31. See, also, 24 Cyc. pp. 810-814, and cases cited in foot notes.

In the case of *Aikin* v. *Wasson, supra,* the court held that a contractor for the construction of a part of a railroad was not a laborer or servant, within the provisions of the statute

making stockholders of a railroad corporation personally liable for the debts due or owing to any of its laborers or servants for services performed for such corporation.

In the case of *Wakefield* v. *Fargo, supra,* the court held that a person employed by a corporation at a yearly salary as a bookkeeper and general manager was not a laborer within the provisions of the same statute in New York.

The view entertained by the court of appeals in this latter case is quoted with approval in the case of *Raynes* v. *Kokomo Ladder, etc., Co., supra.* The question there was whether appellant, who was the general manager of appellee company, was entitled to the lien secured by the provisions of §§7058, 7255 Burns 1894, Acts 1885 p. 36, §3, Acts 1889 p. 257, §1. The court, in considering the provisions of those sections said: "The persons to whom such liens and preference are secured, * * * are mechanics and laborers employed about any shops, etc., who perform manual and mechanical labor. A general manager is not included either in the letter or spirit of these enactments. In speaking of the kind of services which entitled the laborer to the benefit of a similar statute, it is said in *Wakefield* v. *Fargo* [1882], 90 N. Y. 213: 'That he who performs them must be of a class whose members usually look to the reward of a day's labor, or service, for immediate or present support, from whom the company does not expect credit, and to whom its future ability to pay is of no consequence.'"

The case of *Rogers* v. *Dexter, etc., R. Co., supra,* involved the construction of a statute which imposed a liability on the railroad companies to pay for the work of "laborers" employed in the building of roads of such companies. The court, in that appeal, held that the provisions of this statute did not apply to a subcontractor who personally performed labor along with other men employed by him in the construction of a railroad section which he had contracted to build. The court, in considering the application of the statute, said: "In the language of the business world, a

laborer is one who labors with his physical powers in the
service and under the direction of another for fixed wages.
This is the common meaning of the word, and hence its
meaning in the statute. The plaintiff in this case performed
his labor in his own business. He was responsible only for
the performance of his contract. The means for such per-
formance were of his own choice. He need not personally
have performed physical labor at all. He could have em-
ployed all, as well as a part, of the necessary labor. What
physical labor he did perform was not for wages, but to re-
duce the expenses and increase the hoped-for profits of his
contract. He clearly was not a laborer within the common
and statute meaning of the term.''

In the case of *Wentroth's Appeal, supra,* the questions
arose whether Frederic Snyder, who had performed a cer-
tain contract by hiring teams and drivers, but who did no
hauling himself, was a laborer within the meaning of a
statute which gave a preference to ''miners, mechanics, la-
borers or clerks for labor or services rendered by them.''
The court, in that appeal, held that, within the contempla-
tion of the statute, laborers were those who performed with
their own hands the contract they make with their employers.
The court, in passing upon the question, said: ''What class
of persons was intended to be comprehended by the word
'laborer'? We think this question has been very accurately
answered by this court in *Seider's Appeal* [1863], 46 Pa. St.
57. 'By laborers,' says Mr. Justice Woodward, in delivering
the opinion of the court, 'we mean those who perform with
their own hands the contract they make with the employer.'
It is clear that Frederic Snyder does not fall within this
description. The act meant to favor those who earned their
money by the sweat of their own brows, not those who were
mere contractors to have the work done, and whose com-
pensation was the profit they would realize on the transac-
tion.''

Quotations in support of our conclusion might be made

from many of the other authorities hereinbefore cited, but to do so is unnecessary, and would serve only to extend this opinion. It must follow, and we so hold, that the term "laborers," as used in the title of the act in question, cannot be interpreted or construed to apply to a class of persons denominated and known as "contractors," and was not so intended by the legislature, consequently the provisions of §8305, *supra*, must be considered as applying to and including mechanics, laborers and materialmen, and do not embrace contractors. To construe it so as to include contractors would render it to this extent violative of article 4, §19, of the Constitution, for the reason that this class of persons is not within the scope of the title of the act, of which it forms a part.

Counsel for appellees, however, insist that the liens of their clients can be upheld under the provisions of §8295 Burns 1908, Acts 1899 p. 569, which is section one, as amended, of the original mechanics' lien act of 1883, *supra*. But so far as this section can be said to have been enlarged by amendment in the attempt to make it apply to and include contractors, it is open and subject to the same constitutional objections. We conclude, for the reasons stated, that appellees are not entitled to the lien and attorneys' fees awarded in their favor by the lower court, and the decree and judgment to this extent are erroneous.

Under appellants' second proposition it is argued that as this is a case of equitable jurisdiction, therefore it is made the duty of this court, by the provisions of the act of 1903 (Acts 1903 p. 338, §8, §698 Burns 1908), to weigh the evidence upon which the cause was determined by the trial court. This evidence is embraced in a bill of exceptions and was given by witnesses who testified *ore tenus* before the trial court. There appears to be quite a conflict in the evidence upon many of the material points in issue. In fact it may be said that the testimony of appellants' own witnesses upon some material matters is not

fully impressed with harmony, but is conflicting. Appellants' counsel admit in their brief that "there was much conflict in the oral testimony introduced on the trial in the Brennan branch of the case upon certain incidental questions of fact."

In the case of *Parkison* v. *Thompson* (1905), 164 Ind. 609, we construed the act of 1903, *supra,* and held that in a case in which questions of fact depend for their support upon conflicting oral evidence, we will not undertake to reconcile the conflict and decide upon which side lies the weight of the evidence. It was further affirmed in that case that, under the old practice, before the same procedure was prescribed in cases of law and equity by our civil code, no oral testimony was heard in equity or chancery cases at the trial, as the testimony in such cases was in the form of depositions taken before a master or some other duly authorized officer. By this procedure the trial court was altogther deprived of the opportunity of seeing the witnesses and of observing their demeanor and bearing while testifying, and occupied no better position for determining the credibility of the witnesses and weighing their evidence than did the Supreme Court, to which the cause might be removed for review of the questions involved. The holding in the case of *Parkison* v. *Thompson, supra,* has been followed by this court in the following cases: *Hudelson* v. *Hudelson* (1905), 164 Ind. 694; *Ray* v. *Baker* (1905), 165 Ind. 74; *Seiberling & Co.* v. *Porter* (1905), 165 Ind. 7; *Karges Furniture Co.* v. *Amalgamated, etc., Union* (1905), 165 Ind. 421, 2 L. R. A. (N. S.) 788; *Tinkle* v. *Wallace* (1906), 167 Ind. 382.

Under the decisions just cited, the rule that this court will not weigh oral testimony wherein there is a substantial conflict, and determine on which side of the question there is a preponderance, is firmly settled. In such cases, if there is competent evidence to sustain the judgment of the lower court upon all material points, it will not be disturbed upon the weight of the evidence.

The evidence given upon the issues joined between appellants and appellees Brennan & Hogue is quite voluminous, covering as it does many pages of the record. It will be noted that these parties in their complaint allege facts to establish that appellant company was in default in the performance of its part of the contract; that it delayed and hindered appellees in carrying out their part of the contract, by its failure to have ready the necessary poles, material and the grades of the railroad, and thereby enable them to commence and complete the overhead work which they had contracted to do within the period provided in the contract, and upon these facts and others, as averred in their complaint, they base their right of action. The contract under which they were obligated required that all of the work which they had contracted to perform should be completed by August 15, 1903. Certainly when appellant company obligated these parties to do and finish the work within a fixed period, it was its duty to afford them a fair and reasonable opportunity to begin and complete the work, or, in other words, under the mutual contract entered into, it became the duty of the company to furnish the required material, secure the rights of way, and have the road grade in readiness, so that appellees, in the exercise of reasonable diligence, might begin and finish the work within the prescribed period, without being subjected to unreasonable expenses on account of the default, delays and hinderance of appellant company. Its default or failure in these respects would subject it to liability for whatever damages appellees might reasonably sustain on that account. If appellant company violated its contract, as alleged, by the defaults, delays and hinderance charged against it, and thereby prevented appellees from beginning and completing the work which they had contracted to do, the law would hold said company liable for the reasonable value of the work which the contractors performed, and also for any loss sustained on account of their being pre-

vented by said appellant from completing the work which they had undertaken to perform. *French* v. *Cunningham* (1898), 149 Ind. 632, and authorities cited; *Louisville, etc., R. Co.* v. *Donnegan* (1887), 111 Ind. 179; *Lewis* v. *Atlas Mut. Life Ins. Co.* (1876), 61 Mo. 534; *Minneapolis Mill Co.* v. *Goodnow* (1889), 40 Minn. 497, 42 N. W. 356, 4 L. R. A. 202; *Mississippi River Logging Co.* v. *Robson* (1895), 69 Fed. 773, 16 C. C. A. 400.

An examination of the evidence most favorable to appellees discloses that it sufficiently sustains the averments of the complaint. It appears from the evidence that the delays which appellees encountered in the progress of the work should be imputed to appellant company's own default and negligence. Inasmuch as there is evidence in the case which fully supports the judgment of the court, we are not permitted to disturb it upon the question of its weight. Aside from the question of the mechanics' lien and attorneys' fees awarded to appellees, the judgment should be affirmed.

We next turn to the consideration of the questions raised by appellants upon the evidence given in the branch of the case relating to appellee Bick. This evidence covers 3,816 pages of record. Appellants' counsel insist that it is at least our duty, upon this branch of the case, to consider and weigh the evidence, for in doing so we will really determine questions of law, *i. e.*, whether, under the classification clause of the specifications, which were made a part of the working contract entered into by appellant company and appellee Bick, material which, as they claim, is admitted to have been plowed with a ten-inch grading plow with six horses, was loose rock or earth. They assert that the evidence shows that it was the theory of appellee Bick that "if the plows, working in any given material, turn only 'one-fourth of a furrow,' then the contractor was entitled to have three-fourths of the material excavated classified as loose rock and only one-fourth as earth." They argue

that under the contract the test of classification is the means employed in the excavation and not the quantity excavated on a given day.

The evidence shows that the valley of the Wabash river, in Miami county, is enclosed with high banks, dividing the uplands from the lowlands. These banks at irregular intervals are cut by streams flowing from above into the river. Appellants' engineers, in locating the line of the railway in this part of the country, for several miles followed ravines and located the line diagonally across these ravines, and thereby made it necessary, in the construction of the road, to make cuts through the hills, and fills across the hollows. A long fill appears to have been rendered necessary from the bottom of the hill to the bank of the river opposite the city of Peru. The purpose of so locating the road apparently was to get a lower grade than otherwise could be secured. Appellee Bick, as a contractor, did the grading of over twenty miles of the road. A portion of the work which he performed was between Kokomo and Peru, in Howard and Miami counties. The other portion of the grading was in Tipton and Hamilton counties. For the purpose of carrying forward the work, said appellee organized a corps of men and teams and entered upon the work in the spring of 1902. As the work progressed he increased his force by adding thereto other employes and teams. At times it appears that he was delayed in the progress of his work by the failure of appellant company to provide the rights of way, the one immediately north of Kokomo not being secured until the beginning of the following winter, and said contractor was then directed by the company to do his work immediately, in order that the track of the road might be laid. Said appellee, it appears, was delayed by the failures of appellant company until cold weather, which froze the ground so hard that it could not be excavated by plowing. The surface of the earth north of Kokomo is black loam, and on account of its being frozen it became necessary to break it

up by blasting, and to use, in removing it, wagons instead of wheelers, and thereby said appellee appears to have incurred extra expenses on account of money expended by him for powder used in blasting the frozen earth and the extra labor rendered necessary for this purpose. Under the working contract he was to be paid for excavations, but not for fills, and if the earth was hauled more than five hundred feet away from the part where it was excavated, whether it was wasted or put into fills, overhaul was to be allowed. Said appellee declares that at the trial there were four questions of fact in issue in regard to the work performed by him on the line north of Kokomo: (1) The number of cubic yards excavated in constructing the grades. (2) The price for excavating all material that did not come within the class covered by the price fixed at twenty cents a cubic yard. (3) The amount of overhaul. (4) Extra work, material and "force account." It is asserted that no question arose in respect to the classification of material excavated on that part of the line south of Kokomo, for the reason that such material was earth only. But there was on this part of the line a dispute as to the amount of extra work, "force account," and overhaul. In respect to these several points each party introduced many witnesses, including expert accountants, all of whom testified *ore tenus.* It appears that on the line south of Peru there were six cuts. These were known as (1) Cole's No. 1; (2) Cole's No. 2; (3) Redmond's; (4) Jones's; (5) Geve's, and (6) Cassville. The work on this latter part of the road was commenced some time in February, 1903, and was completed the last of the following December. In the performance thereof said contractor employed about twelve hundred men, together with seven hundred teams; all of these, however, were not engaged in work at the same time. The contract provided that

"all material excavated by the contractor under this contract shall be classified either as earth, loose rock

or solid rock, and the chief engineer of the company shall determine how the excavated material shall be classified. In cases of dispute his finding and decision in the premises shall be conclusive on both parties.''

One of the clauses in the specifications provides as follows:

"There shall be no classification of material of any kind other than earth, loose or solid rock, as provided for in these specifications. * * * But this clause of the specifications shall not be construed so as to prevent the application of a percentage system in classifying material as provided in clause two hereof.''

We find nothing in the contract or the specifications which stipulates specifically what shall be classified as earth. Clause two of the specifications provides as follows:

"Loose rock shall comprise: Hard shale or soapstone lying in its original or stratified position, coarse boulders in gravel, cemented gravel, hardpan, other material requiring, in the judgment of the chief engineer of the company, the use of the pick and bar, or which cannot be plowed with a strong ten-inch grading plow, well handled, and drawn by six good mules or horses. It is to be understood that the plowing test shall apply to all the materials named herein, and that only such material is entirely loose rock which, in the judgment of the chief engineer, it is impracticable to plow at all with a strong ten-inch grading plow, well handled, behind a good six-mule or -horse team. Any material in which a portion of a day's work in plowing can be done with a strong ten-inch grading plow, well handled, behind a good six-mule or -horse team, will be classified as a percentage of earth and a percentage of loose rock, the amount of such percentage to be finally determined by the chief engineer of the company.''

The further contention of appellants' counsel is that the provisions of clause two of the specifications are shown by the evidence not to have been properly construed or interpreted by the trial court, or in other words, the contention is advanced that the interpretation accorded to this clause by the company's chief engineer in classifying the material excavated was correct, while, on the other hand, the interpre-

tation placed upon it by the trial court was wrong.  They further insist that under the contract the court did not correctly classify the material excavated on that part of the work north of Kokomo.  Paragraph one of appellee Bick's cross-complaint relies on the written contract of December 6, 1902, while the second paragraph is founded on a contract partly written, but in other respects oral.  It is not claimed that any question of classification arose on the third paragraph.  Whether the court rendered judgment, for the work done north of Kokomo, on the first or second paragraph, the record does not disclose.  It is evident, under the condition of the record, that we are confronted with the difficulty of determining (1) upon what paragraph or paragraphs of the cross-complaint the judgment rests; (2) what particular construction the trial court placed upon the provisions of the contract in respect to classification of material, for the reason that the court's finding is very general, there being (a) nothing therein to apprise us in respect to the amount of material which the court found had been moved by appellee Bick; (b) nothing as to the price allowed him for moving materials; (c) nothing in respect to the amount awarded for the extra work and "force account;" (d) nothing for the overhaul.  Virtually all that is shown by the general finding or judgment is the total amount awarded in favor of appellee Bick, which, outside of attorneys' fees, is $57,969.07.

The provisions of clause two of the specifications, stipulating of what loose rock shall consist, may be divided as follows:

> "Loose rock shall comprise:  (1) Hard shale or soapstone lying in its original or stratified position; (2) coarse boulders in gravel; (3) cemented gravel; (4) hardpan;. (5) any other material requiring, in the judgment of the chief engineer of the company, the use of the pick and bar; (6) material which cannot be plowed with a strong ten-inch grading plow, well handled, and drawn by six mules or horses; (7) it is

to be understood that the plowing test shall apply to all material named herein, and that only such material is entirely loose rock which, in the judgment of the chief engineer, it is impracticable to plow with a strong ten-inch grading plow, well handled behind a good six-mule or -horse team; (8) any material in which a portion of a day's work in plowing can be done with a strong ten-inch grading plow, well handled, behind a good six-mule or -horse team will be classified as a percentage of earth and a percentage of loose rock, the amount of such percentage to be finally determined by the chief engineer of the company.''

The following hypothetical question was propounded by appellee Bick's counsel to S. H. Knight, the chief engineer of appellant company, who testified in its behalf at the trial: ''Assuming, Mr. Knight, that four or five cuts are to be made, varying in length from three hundred to six or seven hundred feet, and varying in depth, say, from fifteen to twenty-seven or twenty-eight feet, and that after the first four feet of the top soil is taken off there is encountered a hard soil or clay, interspersed with rocks or boulders, so that in attempting to plow it every five to ten feet with a heavy ten-inch grading plow, drawn by from four to six heavy horses, the plow is turned out by some boulder, or becomes fast under the boulder, so that when it is fast there is great difficulty in extracting the plow; that in plowing, or attempting to plow, the plow does not enter the ground more than three inches and often less; that a furrow from three to five inches wide is turned up, two men riding on the whiffletree, some times one man in addition on the plow-beam, some times one man holding the plow handle, and some times two, the dirt hauled off by wheelers, which are very often being tripped by boulders which are being developed by the plowing, heavy boulders so large that they have to be blown out with dynamite and hauled off by chain, they being so large that a team cannot snake them, but they have to be rolled with a rolling hitch; three or four fur

rows have to be plowed before the wheeler can attempt to fill at all; then being compelled to go one hundred feet, then get say one-third of a load, being compelled to go to the fill that way because they could not get enough dirt in front of the wheelers to shove the dirt back in to the wheelers, —I wish you to state to the court, you being familiar with the specifications in the contract and using that knowledge, whether or not any portion of that soil or clay or boulders should be classified as loose rock under the specifications?'' The answer of the witness to this question was: ''On these specifications, I would not.''

The following hypothetical question was also propounded to him: ''Assuming that after the yellow clay is taken off, several feet of it, that there was encountered a blue clay a little harder than the yellow, but with comparatively few boulders and stones, and that it was excavated in the same way I have detailed [meaning as detailed in the previous question], except it was not necessary to use dynamite or to pick out the boulders, what would you say as to whether or not any portion of that blue clay should be classified as loose rock, under the specifications?'' The answer of this witness was: ''I would not.''

There is evidence in the record to establish the facts stated in these questions and therein assumed to be true, and that material excavated, as therein stated, was classified by the engineer entirely as earth. Counsel for appellee Bick claim (1) that his answers to the questions quoted clearly show that he placed a wrong legal construction upon the provisions of clause two of the specifications hereinbefore set out; (2) that his answers to the questions disclose that upon the subject of classifications he was so prejudiced against appellee Bick and in favor of appellant company, his employer, and of which he was a stockholder, that he was not a fit person to settle the question of classification.

We will endeavor particularly to point out wherein, as

we believe, the engineer, as shown by his answers to the previous questions, misinterpreted the provisions of the specifications in regard to what material should be classified as loose rock. It is true that there is a provision in the specification in question that the chief engineer of the company should determine how matter excavated should be classified, etc., and his decision, in case of dispute, was to be conclusive on both parties. This provision, however, contemplated, under all circumstances, the exercise of an honest judgment on the part of the engineer upon the matter involved. This court has held that stipulations or provisions of this character cannot operate to deprive the parties of the right to resort to the courts for a redress of wrong or to a recovery of whatever may be due to them. *Louisville, etc., R. Co.* v. *Donnegan, supra; Kistler* v. *Indianapolis, etc., R. Co.* (1882), 88 Ind. 460; *Board, etc.,* v. *O'Connor* (1894), 137 Ind. 622; *Board, etc.,* v. *Gibson* (1902), 158 Ind. 471; *McCoy* v. *Able* (1892), 131 Ind. 417.

The rule generally affirmed by the authorities is that the measurements, estimates and classification of material, in cases where they are left to the judgment or decision of the engineer, are accepted as *prima facie* correct, and to that extent are binding upon the parties to the contract, in the absence of fraud, or gross or obvious mistake on the part of such engineer, and the burden is upon the party who assails them to establish such fraud or mistake. *McCoy* v. *Able, supra;* 3 Elliott, Railroads §1059.

As previously shown, appellee Bick, under his cross-complaint, assailed the decisions or findings of the chief engineer, on the ground that he acted arbitrarily and that his judgment was impressed with gross mistakes and fraud. Without regard to the controlling effect which, under any circumstances, might be accorded to the provision or stipulation in the contract that the decision of the chief engineer as to estimates, measures, etc., was con-

clusive in cases of dispute, the provision certainly cannot control in respect to the contract so as to preclude either party from controverting any construction or interpretation which the engineer may have placed upon it, for it is elementary that it is the province of courts to construe contracts. Consequently, as claimed by counsel for appellee Bick, if the engineer misinterpreted the provisions of the contract in his classification of loose rock by applying the "plow test" either to the first, second, third or fourth clause of the stipulations as hereinbefore set out, then said appellee would be entitled in this action to have such errors of the engineer reviewed by the court and corrected. *Williams* v. *Chicago, etc., R. Co.* (1892), 112 Mo. 463, 20 S. W. 631, 34 Am. St. 403; *Lewis* v. *Chicago, etc., R. Co.* (1891), 49 Fed. 708; 30 Am. and Eng. Ency. Law (2d ed.) 1271. Counsel for appellants contend that the stipulations in clause seven, viz.,

"it is to be understood that the plowing test shall apply to all material herein named,"

modifies or destroys the classification of material immediately preceding, as specified under clauses one, two, three and four, or, in other words, that while the provision of the specification by which the contracting parties expressly agreed that "hardpan," and "coarse boulders in gravel," should be classified as loose rock, nevertheless it was intended that such material was subject to the plowing test provided for by clause six. The provisions of the specification must be construed together and given a reasonable interpretation, and they should not be construed in such a manner as to lead to absurdity.

By the second clause the parties were dealing with the plowing test as provided by clause six next preceding. This test was to apply to all material coming within its meaning, that is to say, as therein provided only such material was to be considered as entirely loose rock

which, in the judgment of the chief engineer, it was impracticable to plow at all with a strong ten-inch grading plow, well handled, etc., or, in other words, impracticable to plow the material, in the judgment of the chief engineer, when the plow test was applied. It is manifest that the latter test was not intended to refer to or control the particular material specified as hardpan, etc., which the parties had already declared should constitute "loose rock." To hold to the contrary would be absurd.

We may assume that appellant company and appellee Bick, in entering into the contract, recognized that the materials specified in the first, second, third and fourth clauses were well-known, hard substances, quite difficult to excavate, therefore they mutually declared that they should be classified as loose rock. Doubtless the parties believed that other hard material might be developed in excavating, and therefore the pick and bar test and the plowing test were provided for other hard earth not specifically falling within that mentioned in the preceding clauses.

In the case of *Lewis* v. *Chicago, etc., R. Co., supra,* the specification involved was as follows: "Loose rock shall comprise (1) shale or soapstone lying in its original or straified position, coarse boulders in gravel, cemented gravel, hardpan, or any other material requiring the use of pick and bar, or which cannot be plowed with a strong, ten-inch grading plow, well handled, behind a good six-mule or -horse team." It will be observed that this is virtually the same as the one with which we have to deal. It appears in that case that, as the engineers construed the specification, "shale, cemented gravel, hardpan," etc., were not classified as loose rock unless more than six horses or mules were required to plow such material. The court in that case, in determining whether the engineers had properly construed the specification, said: "After an attentive consideration of the question, the court concludes that the engineers put a wrong construction on the second clause of the specification,

so far as they construed the 'plowing test' to be applicable to shale, soapstone, cemented gravel, and hardpan, as well as to other hard, earthy substances. The right interpretation of the clause is as follows: Shale, soapstone, cemented gravel, and hardpan were known substances, and were known to be hard to handle. Therefore it was declared that they should be classified as loose rock. And inasmuch as it was thought probable or possible that other hard earths might be encountered in the progress of the work, it was agreed that any other material requiring the use of pick and bar, or that could not be plowed 'with a strong, ten-inch grading plow, * * * behind a good six-horse or -mule team,' should likewise be classified as loose rock. This is the correct exposition, and truly expresses the thought in the mind of the draughtsman. * * * By far the largest portion of all the material found in the various cuts, except the rock cuts, was broken up, I think, by the use of a team of not more than six horses. Probably that was the most practicable and economical method of working the cuts, as an eight-horse team is usually cumbersome. Nevertheless if the engineers had classified every cubic yard of earth that was so broken up with six horses 'as earth excavation,' it would not have accorded with the spirit of the contract.''

In the case of *Williams* v. *Chicago, etc., R. Co., supra,* identically the same specification was involved as in the case of *Lewis* v. *Chicago, etc., R. Co., supra.* In the case first cited the plaintiffs claimed and offered to show that the engineer had construed hardpan to be loose rock only ''when it could not be plowed with a strong ten-inch plow, behind a good six-horse or -mule team.'' The plaintiffs further contended that under this clause of the contract the classification of hardpan as loose rock was fixed without any reference to the plowing test. The court sustained this contention, saying on page 493: ''We think the plaintiffs are correct in their interpretation of the clause, and, if the engineer did so misconstrue it, he exceeded the power vested

in him by the contract, and there is no principle of law or equity that demands that plaintiffs should submit to a misconstruction of their contract which would result in serious loss to them. The contract fixed certain classifications of material; others it left to the judgment of the engineer.'' The court further affirmed that plaintiffs were entitled to show, if they could under their complaint, that the engineer misconstrued the contract in his classification of the loose-rock clause, and had not measured the work according to the contract; that an allegation of fraud was not necessary to entitle them to make such a showing.

The interpretation of the term ''loose rock,'' as used in the specification in question, for which appellee Bick contends, is manifested by the statements of facts in the hypothetical question propounded to the chief engineer. Appellants' counsel, however, deny that said appellee's contention in respect to the construction is correct within the meaning of the contract, but affirm that the one accorded to it by the chief engineer is right. The infirmity of the interpretation placed upon the specification by appellant company's engineer is that it accords with neither the letter nor spirit of the contract. We have, we believe, sufficiently shown that the engineer was wrong in the construction which he accorded to the specification as to how the material mentioned in the hypothetical question should be classified. In addition to this we may say that the provision, ''any other material  *  *  *  which cannot be plowed,'' must be construed to mean such hard material or substance as cannot be plowed with reasonable facility. The term ''plowed'' was certainly used in its usual meaning, and must have been so understood by the parties. They did not mean the mere ''rooting up'' of the material, or cutting a very shallow furrow, or such plowing as would require men to ride upon the whiffletree and upon the plowbeam in order to keep the nose of the plow in the material which they were attempting to plow. It is not tenable to argue that plowing, within the

meaning of the test provided, was accomplished where, as the evidence shows, the material attempted to be plowed was hardpan, or contained many large and coarse boulders and cemented gravel, and that thereby the plow would frequently be turned out of its shallow furrow, and would become fastened beneath the boulders, so that the men handling it would be required to resort to the use of the pick and bar to loosen or extricate it from the boulders; that it required the force of several men to hold the point of the plow in the ground; and that the plow point would frequently be broken by the hardness of the material which was encountered in the progress of the work. Certainly it could not in reason be said that such material, within the meaning and spirit of the contract, should be classified as ordinary earth, to be removed by the contractor at twenty cents a cubic yard. A converse view, however, is apparently entertained by appellant company. There was no price fixed by the contract for excavating loose rock, and said contractor was entitled to only the reasonable value of such work, which value, as shown by the evidence, is far in excess of that provided in the contract for the removal of earth. Appellee Bick claimed that the only feasible and practicable, as well as the cheapest, method of loosening and breaking up much of the material which was encountered in the work in some of the several cuts was by means of a plow, and that only a small portion of it could be removed by the ordinary method employed for removing earth. After showing the character of the material, the number and size of boulders, and the great labor and difficulty experienced in loosening, excavating and removing the material in question, and the only practicable method by which it could be broken up, the contractor was asked the following questions: "Q. Now, what other method did you adopt there, trying to excavate this earth, except the way you have already detailed? A. Well, the boys tried to pick it and tried to blow it out. Q. How did you pick it? A. Run a pick down as far as he could drive

it, and bring it up. He would just jerk out what was on the pick. Q. Could he bury the pick in to the handle? A. It was too hard. Q. Now, you spoke of blowing up with dynamite? A. Powder; it would not take any effect on it, just blow out whatever hole they put it in. Q. Now, you have been a contractor a good many years. Tell the court what method of loosening this earth was there known or available other than to do it with a plow as you did it? A. Under these conditions, nothing more.''

Appellee Bick's testimony was supported by many other witnesses. Because he employed the plow as the most feasible and available method of loosening and breaking up the material in controversy, certainly affords appellant company no room for insisting that such material should be classified entirely as earth, to be paid for at twenty cents a cubic yard, mainly for the reason that the excavation thereof was principally done with a plow as the most feasible, practicable and the cheapest method, as the evidence fully establishes. What appellee did in this respect could not be said to be plowing, but merely, in common parlance, ''rooting out'' the boulders and breaking up the hard substances with a strong grading plow which was used.

Counsel for appellee Bick examined many witnesses upon the trial of the cause, some of whom were expert civil engineers. The evidence given by the men employed in excavating and grading appellant company's railroad shows that much of the material developed in some of the several cuts was hardpan, and that other parts thereof, to quite an extent, were intermingled with large and small boulders. The material encountered in the attempt to plow was so hard that some times the plow points would last only two or three hours. One witness testified that the material was so hard that he could not drive a harrow tooth down through it; that in his attempt to do so the tooth was bent, although it did not strike any boulder or rock. Others testified that dynamite was employed to break up the material, without much

success; that it was useless to try to remove it with a force of ten or twelve horses attached to the plow; that the more horses used in drawing the plow, the more difficult it was for the men to keep the plow in the ground; that all that could be done was simply "to root" along; that six, seven, and sometimes as many as eight horses were used, but on account of the hardness of the material and the many boulders encountered it was found impracticable to use this number of horses. Four horses were all that it was practicable to use in breaking up the material.

It is not necessary that we give the evidence in detail upon the many points in dispute before the trial court, for to do so would, under the circumstances, serve no useful purpose. Suffice to say that the evidence, as we find it in the record, is ample to sustain the allegations of appellee Bick's cross-complaint, and the finding and judgment of the lower court upon all material points. In fact, it may be said that had the court given full credit to the testimony of said appellee it would have been justified in awarding a recovery in his favor of a much larger amount than it found was due to him. As heretofore shown, the contention of appellant company's counsel, that the lower court erred, upon the ground that it did not adopt the construction of the contract for which they contend, even if true, cannot be sustained. It does not appear that during the progress of the work there was any substantial dispute on the part of said appellant's engineer in regard to the estimates and classification of the material to which said appellee was entitled. Instead of making estimates and classifications, which, as shown, said appellee frequently requested should be made, the engineer merely promised to do so, but failed to carry out his promise. The controversy appears to have arisen after said appellee had completed the work and turned it over to appellant company. It appears that he was anxious that estimates and classifications should be made by the company's engineer in order that he might know what

he was being allowed. His pay roll at the time was running high; some weeks to $14,000.

He testified that he asked Mr. Knight, the chief engineer, about making estimates and classifications of material excavated, saying to him that he thought the matter ought to be settled so far as the work had progressed, stating to the engineer that the estimates which had been made were ''rather shy.'' The engineer, in reply to this, as shown by said appellee's testimony, said: ''Mr. Bick, my monthly statements are to a certain extent guesses; they are approximates only. When you get through with your work you will have every yard and every yard of overhaul and your proper classification, so don't worry about them; I am going to treat you right.'' Appellee Bick also appealed to the assistant engineer, who told him that there was a mistake in the overhaul, and that he would make it right next month, and he also promised to see that a detailed statement of the estimates should be furnished to said appellee, but this promise was not carried out. Said appellee testified that he also had a conversation with Mr. Drum, the general manager, in August or September before the work was completed, and informed him that he was getting ''pretty rough treatment'' as to estimates. Appellee Bick testified: ''I told him my judgment was that I was not getting my yardage, and when was I to get my overhaul up to that time? They had practically allowed me nothing, only a trifle on classification. That I needed the money; that they ought to give it to me; that he ought not to hold it until the job was done; that I ought to receive it as we went along.'' The general manager said in reply to this: ''Mr. Bick, these engineers are narrow. It is hard to get a good man. You will come out all right when you get through.''

This evidence stands undisputed, and at least tends to show, as insisted by appellee Bick, that he was thereby

14. induced to wait until his job was completed, in the belief that he would be fairly dealt with and treated

at the final settlement. It appears that appellants adopted the method of measurement denominated and known in mathematics as the "prismoidal formula," while the witnesses for said appellee, who testified as to the number of yards of material excavated, adopted and used the method known as the "average and area." Expert engineers testified *pro* and *con* as to the correctness of these two methods. Appellants argue that the court adopted the latter method, but in respect to this contention we are not apprised by the record which method of computation or measurement the court adopted, therefore the question as to which of these two methods is the most correct is not before us for determination.

It follows from the conclusions which we have herein reached that the judgment below must be in part reversed and in part affirmed. It is therefore ordered that all that part thereof which adjudges and awards a statutory lien in favor of the respective appellees and attorneys' fees thereon, and a foreclosure of such lien, be reversed, with instructions to the lower court, on motion of appellants, to modify the judgment or decree to that extent. In all other respects the judgment is affirmed.

Myers, J., did not participate.

## ON PETITION FOR REHEARING.

JORDAN, J.—Appellants separately petitioned for a rehearing, on the grounds (1) that each of them was entitled to a trial by jury in the lower court; (2) that their right to a jury trial was not waived. Appellee Bick has also petitioned for a rehearing of this case, so far as may be necessary for the court to amend and modify its judgment and thereby fully sustain and affirm the judgment and decree of the Howard Circuit Court. He claims that if he is not entitled to a lien as a contractor under the act of 1883, that his right thereto is saved and awarded to him by virtue

of an act of March 10, 1873 (Acts 1873 p. 187, §§5301-5303 R. S. 1881), entitled: "An act to give security to persons who contract with railroad corporations to perform work and labor in the construction of railroads," which act he claims has never been repealed, but is in full force and effect.

Other attorneys, on behalf of parties interested in like cases, in upholding their right to a lien as contractors, in briefs filed herein, criticize the decision as not being supported by the authorities cited, etc.

The arguments in the main advanced by appellants for a rehearing are (1) that the decision in this appeal denies to them the right of a trial of the cause by jury, a right, as they properly claim, guaranteed under the state Constitution; (2) that there should be a reversal of the judgment in its entirety, a new trial ordered, and the cause remanded to the lower court in order that they may be afforded an opportunity to demand a trial by jury as a matter of right. It is further contended that during the progress of the trial below appellants were not in a situation to demand a trial by jury, for inasmuch as this suit is to foreclose a statutory lien, it, under our decisions, was of equitable cognizance and therefore triable by the court; that therefore a trial by jury could not be demanded as a matter of right, and to have requested the lower court to submit the cause to a jury would have been but a useless formality. They further argue that they demurred to the complaint for want of facts, that their demurrer was overruled, to which ruling they excepted; that they objected to the introduction in evidence of the notice in respect to the lien sought to be enforced by appellee Bick, and that by these affirmative acts on their part they raised the question of their right to a trial by jury, and that such right was by these acts clearly preserved. It is not claimed, however, that they made any request whatever in the lower court for a jury trial, and there is no ruling of the court in

denying any such demand assigned in the motion as a reason for a new trial.

Appellants, in their contention that by the demurrer to the complaint and objection to the introduction of the notice of the lien in evidence they raised and preserved the right to a jury trial, are clearly mistaken in their view of the question. In fact the only point presented by the demurrer and determined by the court in its ruling thereon was that the complaint stated a cause of action. If the complaint, independently of appellee Bick's right to the lien in controversy, sufficiently stated a cause of action to entitle him to a personal judgment, then the demurrer was properly overruled. Our cases generally affirm that if a complaint is sufficient to entitle the plaintiff to any of the relief demanded, a demurrer thereto should be overruled. *Linder* v. *Smith* (1892), 131 Ind. 147; *Yorn* v. *Bracken* (1899), 153 Ind. 492; *Chicago, etc., R. Co.* v. *Woodard* (1902), 159 Ind. 541; *Oölitic Stone Co.* v. *Ridge* (1908, 169 Ind. 639. See, also, *Shepardson* v. *Gillette* (1892), 133 Ind. 125; *United States Sav., etc., Co.* v. *Harris* (1895), 142 Ind. 226.

Opposing counsel insist that appellants waived their right to a jury trial by submitting the cause to the court without requesting that they be awarded a jury, and in not interposing any objections to the submission of the cause to the court for trial. It is insisted that an entry of record in this case fully discloses that appellants consented to the submission of the cause to the court for trial, and that thereby a jury trial was expressly waived. This entry is as follows: "Come the parties by counsel, and this cause being at issue and called for trial, the same is now submitted to the court for trial, without the intervention of a jury."

As preliminary we may say that we might properly deny appellants' petition for a rehearing, on the ground that they

are not in a position to have a review of the question which they present at this stage of the case. But as their counsel assert that it is one which is before this court for the first time, and as they evince much earnestness in their argument, we have concluded to consider their points, and herein give our reasons to show that their contentions in support of the petition are untenable.

The question then is, Did appellants, in the lower court, either expressly or impliedly, waive their right to a trial by jury? Section twenty of our bill of rights (Const. Art. 1, §20) declares that "in all civil cases, the right of trial by jury shall remain inviolate." That this right, in all civil cases where it exists, may be waived by a party entitled thereto is not disputed. Section 576 Burns 1908, §550 R. S. 1881, provides the manner by which parties in a civil action may expressly waive their right to a jury trial: (1) By failing to appear at the trial; (2) by a written consent in person or by attorney, filed with the clerk; (3) by the oral consent in open court entered on the record. That this right may also be impliedly waived by a party failing at the proper time to make a demand or request for trial by jury is a proposition well settled by repeated decisions of this court. *Madison, etc., R. Co.* v. *Whiteneck* (1856), 8 Ind. 217; *Burgess* v. *Matlock* (1859), 12 Ind. 357; *Sprague* v. *Pritchard* (1886), 108 Ind. 491; *Jarboe* v. *Severin* (1887), 112 Ind. 572; *Sheets* v. *Bray* (1890), 125 Ind. 33; *Blair* v. *Curry* (1898), 150 Ind. 99; *Boonville Nat. Bank* v. *Blakey* (1906), 166 Ind. 427.

In the case of *Madison, etc., R. Co.* v. *Whiteneck, supra,* this court said: "If a party voluntarily abstains from claiming the right [of trial by jury] in a given case, we think it may be judicially held that it is waived."

We quote from the syllabus in the following cases: *Jarboe* v. *Severin, supra:* "Where a party does not ask for a trial by jury, nor object to a trial of the cause by the court, with the jury as advisory merely, it is too late to object on appeal

to the mode of the trial.'' *Sheets* v. *Bray, supra:* ''Where the right to a trial by jury exists, and no request is made for the same, it will be considered as waived.'' *Blair* v. *Curry, supra:* ''A jury trial is waived by a failure to demand it at the time of trial.''

In the case of *Boonville Nat. Bank* v. *Blakey, supra,* this court, after considering the manner by which a jury may be waived, as provided by §576, *supra,* on page 448, said: ''While it does not admit of doubt that there may be an implied waiver of the right of a jury trial, yet such waiver will not be predicated upon a doubtful implication.'' Or, in other words, where the waiver is predicated upon implication, the intention of the party to waive his right to a jury should be clearly manifested.

In the case of *Goodwin* v. *Hedrick* (1865), 24 Ind. 121, this court held that an agreement to refer a cause to a referee for hearing was totally inconsistent with a submission to a jury, and was, therefore, a waiver of a jury trial. See, also, *Taylor* v. *Trustees, etc.* (1893), 7 Ind. App. 388; *Whitestown Milling Co.* v. *Zahn* (1894), 9 Ind. App. 270.

In the case of *Hauser* v. *Roth* (1871), 37 Ind. 89, the appellant was present in court by his counsel when the cause was ordered to be referred to a master in chancery to find the facts and report his finding to the court. Appellant in that case was ordered by the court to furnish the master with a bill of particulars, and with this order he complied. He was also present in court by counsel when the master filed his report, which was ordered to be spread of record. The appellant, as it appears, in that appeal, interposed no objections to the referring of the cause to a master, and made no objections to the court's order at any stage of the proceedings. After the filing of the master's report, containing the finding, appellant then demanded a trial by jury, but his demand was overruled, to which ruling he excepted. In reviewing the question, on appeal, as to whether he had waived his right to a trial by jury, under the facts in that

case, this court, after quoting from the provisions of the civil code of 1852 (2 R. S. 1852, p. 115), which provided the mode by which a jury trial might be waived (being the same provisions now embraced in §576, *supra*), held that appellant, in not objecting to the order of the court in submitting the cause to a master in chancery for a finding, must be presumed to have given his oral consent in open court, which was entered of record, and that thereby he waived a jury trial within the spirit of the third mode provided by §576, *supra*. The court, speaking by Worden, J., said: "Here it will be seen that the parties were in court at the time the court made the order referring the cause to the master, and requiring the appellant to furnish him with a bill of the particulars of the itemized account claimed in his answer. * * * The appellant, by his attorneys, was present when the order was made, and submitted, not only to the order of reference, but the order requiring him to furnish the master with the specified bill of particulars, making no objections thereto whatever. He must be presumed, therefore, to have consented. If he had required a trial by jury, a mode entirely inconsistent with a reference of the cause to a master, he should then have objected to the reference."

The decision in the case just quoted from, upon the question involved, is quite applicable to the one in the case now before us. Appellants, at the time this cause is shown to have been submitted to the court for trial, without the intervention of a jury, were present in court by counsel, and, as nothing to the contrary appears, it must be presumed that the entry of record in respect to the submission of the cause to the court was predicated upon the oral consent of appellants and appellees, and thereby falls within the third mode prescribed by §576, *supra*, and must be held as an express waiver of a jury trial by appellants and appellees; consequently appellants cannot be heard to say that they were in any manner denied the right to a trial by jury. It is a well-settled rule, recognized by our decisions, that where a

party is in court in person or by counsel, and an opportunity is afforded him at the proper time to assert his legal right, his failure to do so is considered as a waiver of such right. *Zehnor* v. *Beard* (1856), 8 Ind. 96; *Preston* v. *Sandford* (1863), 21 Ind. 156, and authorities cited; *Adams* v. *Board, etc.* (1905), 164 Ind. 108, and authorities cited.

There certainly is no merit in the argument advanced by appellants' counsel, that as this suit involved the foreclosure of a statutory lien, and is therefore of equitable jurisdiction, or, in other words, triable by the court and not as a matter of right by jury, they were not in a position to demand a jury, and to have interposed such a demand would have been an idle formality and of no avail. Appellants were bound to know what were their legal rights, and properly to assert them. Their counsel in this appeal successfully raised the question that appellee Bick was not, under the law, entitled to the lien which he sought to have enforced. We have no reason to presume that they were not impressed with the same view of the law when the cause was submitted to the court for trial. Under the circumstances, appellants' counsel are not warranted in their contention that to have demanded a jury in the case would have been of no avail. Conceding that the lower court possibly might have denied this demand, still this would not have rendered it unavailable to appellants, for had the record disclosed that a request for a trial by jury had been made at the proper time, but was overruled by the court, and that such ruling was assigned as a reason in the motion for a new trial, then, upon reaching the conclusion, as we did, that under the law appellee had no right to the lien which he claimed, we would have considered no other question raised in the case, but for the error of the court in refusing a jury trial we would have ordered a reversal of the judgment as a whole and have remanded the cause to the lower court for a new trial, with instructions to grant appellants' demand for a trial by jury and for further proceedings.

The claim is advanced by appellants that because the court, instead of a jury, was permitted to try and determine the cause, it was therefore tried upon the wrong theory, to their injury, and hence for this court to affirm as correct the action of the trial court in rendering a personal judgment it must be made affirmatively to appear that substantial justice was done in the trial below. Or, in other words, even if remanded for a new trial, a jury will be compelled to reach the same conclusion as that arrived at by the trial court. This contention is certainly untenable and devoid of merit. If the contention be true in respect to the wrong theory arising out of the trial by the court, then it may be said that appellants helped to bring about this wrong theory by their failure to demand a jury trial, and by consenting to the submission of the cause to the court, thereby giving the lower court to understand that they entertained the view that under the law the case was not triable by jury as a matter of right. The parties undoubtedly, in the lower court, acted upon the assumption that the issues were triable by the court, without the intervention of a jury, and certainly neither party will be permitted to depart from this theory upon appeal to this court. Elliott, App. Proc. §490.

The decision in the case of *Shaw* v. *Kent* (1858), 11 Ind. 80, so far as it can be said to hold that a trial by jury can only be waived by a party by some one of the modes prescribed by §576, *supra,* is inconsistent with the holding of this court in its many decisions to which we have referred, and upon this point the case of *Shaw* v. *Kent, supra,* has been, at least impliedly, overruled, and no longer can be considered as an authority.

By reading the original opinion it will be seen that we did not hold that §8305 Burns 1908, Acts 1889 p. 257, §6, was invalid, but the holding was that its provisions did not apply to contractors such as was appellee Bick; that to construe it so as to make it apply to him would render it antagonistic to article 4, §19, of the

Constitution, for the reason that contractors of his class were not within the scope of the act as originally entitled. To the many authorities cited in our opinion we may now add Phillips, Mechanics' Liens (3d ed.) §157, wherein the author says: "But when we study the legislative intention in the enactment of a law granting those who work chiefly through physical means certain privileges, it is possible to see that the term 'labor' is used in a restricted sense, and not in its broad and comprehensive meaning. The object of the lien laws, now almost universal, is not doubtful, on authority at least. One purpose may have been to protect the laboring man, the man whose subsistence depends on the wages earned by his own manual labor, from the reckless improvidence of his employer, and to furnish him with ample security for his earnings, which ordinarily he could not successfully demand. If this was the intention of the legislature in the passage of the law in question, then it follows that it does not apply to contractors employing men and teams to cut and haul timber, doing no manual labor themselves, and deriving their compensation from the profits realized. Most of the authorities that we have examined support this view of the law, except in cases where, from the wording of the statutes, a different intention clearly appeared."

In opposing the contention of appellee Bick, that he has the right to have and enforce a lien under the act of 1873, *supra,* counsel for appellants insist that his contention cannot be sustained (1) because that act was repealed by the act of 1883; (2) that if not repealed, nevertheless appellee Bick and his coappellees are not embraced within its provisions. We pass without deciding the question raised in respect to the repeal of this statute, and consider the second point advanced by appellants' counsel.

The act of 1873, *supra,* is entitled: "An act to give security to persons who contract with railroad corporations

to perform work and labor in the construction of railroads."
It will be observed that the persons mentioned in the title
are those who contract to perform work and labor. The first
section of the act (§5301 R. S. 1881) under the provisions
of which a lien is awarded, provides that "all persons who,
by contract with any railroad corporation or company, shall
perform work or labor for any such corporation or company
in the way of grading, building embankment, or making
excavation for the track of any railroad, * * * shall
have a lien upon such grading, embankment, or excavation."
It is manifest, we think, that this section, so far as it pro-
fesses to apply to or include persons entitled to its bene-
fits, is no broader than section twelve of the act of 1883,
and cannot be said to create a right to a lien upon the prop-
erty of appellant railroad company in favor of appellee.
Neither the title nor the body of the act of 1873, *supra*,
can apply to a contractor such as appellee Bick, or
to a person to whom the work of constructing a railroad is
let, and who, in carrying out his contract, performs no
manual labor himself, but, as the authorities assert, em-
ploys men and teams in the performance of his contract,
and "derives his compensation from the profits realized."
By the plain language of the act of 1873, *supra*, the right
to a lien is limited to all persons who by contract, either
express or implied, "perform work or labor," etc.

It follows that each of the petitions of appellants and the
petition of appellee Bick for a rehearing should be over-
ruled, which is accordingly ordered.


## ON MOTIONS TO RETAX COSTS.

PER CURIAM.—After the decision in this appeal, the clerk
of this court appears to have taxed all the costs against ap-
pellees. Appellee Bick, in his own behalf and in behalf of
his coappellees, has filed a motion to retax costs therein,
requesting the court to order the costs accruing by reason

of this appeal to be taxed against appellants: (1) That the costs of the transcript, except that part thereof which embraces the pleadings and the rulings of the court thereon, be taxed against appellants; (2) that the costs arising out of the order of publication and serving of notice upon the coappellants be also taxed against appellants; (3) that the court make such further order in regard to the taxation of costs as may appear proper and right in the premises.

As shown in the opinion given on the original hearing, there were two branches of this cause in the lower court, one made and maintained by appellees Hogue & Brennan under their complaint, and the other by appellee Bick under his cross-complaint, upon which he recovered the judgment in his favor. Each of these branches upon appeal presented in common the right of appellees respectively to have and enforce a lien under the act of 1883 (Acts 1883 p. 140). In considering the motion to retax costs, the judgment of the lower court may be separated into two parts, one awarding a recovery of money in favor of appellees Hogue & Brennan on their complaint, a foreclosure of the lien set up in their complaint, and attorneys' fees thereon; the other part awarding a recovery of money in favor of appellee Bick, and a foreclosure of the lien claimed by him upon his cross-complaint, and attorneys' fees thereon. The pleadings in each branch of the case appear to have been made up jointly, but each branch appears to have been tried separately. The bill of exceptions containing the evidence given upon the trial of the issues between appellants and appellees Hogue & Brennan begins on page 333, volume one, of the bill, and continues to page 1381, volume two. The evidence given upon the trial between Bick and appellants begins on page 1381, volume two, of the bill of exceptions, and embraces the remainder of that volume and all of volumes three and four. All that part of the judgment of the lower court which awarded the recovery of money, other than attorneys' fees, in favor of Hogue &

Brennan was affirmed, as was also the part thereof which adjudged a recovery of money, other than attorneys' fees, in favor of appellee Bick on his cross-complaint. The part thereof which decreed the foreclosure of the respective statutory liens claimed by appellees, and which also decreed attorneys' fees in their favor, was reversed and the case remanded, with instructions to the lower court to modify the judgment by eliminating therefrom the part under which the foreclosure of appellees' respective liens and attorneys' fees thereon were decreed. The effect of this order was to open the case in the lower court so far only as to permit the lower court to modify the judgment as ordered. The question now arises, How shall the costs accruing by reason of the appeal to this court be taxed and apportioned?

Section 706 Burns 1908, §664 R. S. 1881, prescribes a general rule for awarding costs in cases on appeal. This section provides: "When the judgment is affirmed in whole, the appellee shall recover costs; and when the judgment is reversed in whole, the appellant shall recover costs in the Supreme Court and the court below, to the time of the first error for which the judgment is reversed, which shall be pointed out in the opinion of the Supreme Court. In all other cases, costs shall be awarded as the court may deem right, following, as nearly as possible, the general regulation for awarding costs."

In Elliott, App. Proc. §575, the author says: "The appellate tribunal possesses such broad and comprehensive power to mold and frame its judgments so as to do substantial and complete justice between the parties, that it can always make such orders respecting costs and their apportionment as may seem just and equitable." Again, in Elliott, App. Proc. §581, it is said: "As a general rule the reversal carries the costs from the first error. But the plenary power of the court to so mold its judgments as to do equity enables it to apportion the costs

equitably, and it does not invariably adjudge costs according to the general rule stated.''

To recapitulate: Appellants, by their appeal, prevailed only to the extent of securing a reversal of the judgment so far as it awarded appellees a foreclosure of the liens in question and attorneys' fees thereon. As a result of the reversal, the lower court was directed to strike out all that portion of the judgment which ordered a foreclosure and allowed attorneys' fees in favor of appellees. On the other hand, appellees prevailed in the appeal by defeating a reversal of the judgment so far as it awarded a recovery of money in their favor, other than attorneys' fees. In order to obtain the relief which was awarded to appellants, it was not necessary for them to bring up the evidence given upon the trial below. In fact, the evidence as it appears in the record virtually consists of that which was given *pro* and *con* upon the issues in respect to the recovery of the money which appellees claimed was due and owing to them under their respective contracts. A question in regard to the modification of the judgment of the trial court, if properly presented to that court, will on appeal to the Supreme Court, if exhibited by the record, bring before the latter court for review such question or point in respect to the modification of the particular judgment or decree. Elliott, App. Proc. §327.

We therefore order (1) that the costs accruing by reason of the appeal taken by appellants, except those accruing upon their petitions for a rehearing, and also except that made on account of bringing up the evidence, be taxed to and paid by appellees; (2) that all costs made and accruing by reason of the bill or bills of exceptions embracing the evidence given upon the trial be taxed to and paid by appellants.

JORDAN, J.—It appears from the records in the office of the clerk of this court that there has been taxed by that officer, as costs against appellees in this appeal, the sum of $1,010.93 paid by appellant company to the Federal Union Surety Company as a premium for its becoming the surety of said appellant on its appeal bond executed in the prosecution of the appeal.

Appellees have filed a motion to strike out this item of cost (1) for the reason that they are not liable to pay such costs; (2) that there is no legal warrant for taxing as costs against appellees the money paid by appellant company as a premium to said surety company.

Appellant company bases its right to recover against appellees as costs the amount in controversy upon that part of section twenty-five which we have embraced in italics of an act entitled "An act for the incorporation of bonding or surety companies, defining their powers, prescribing the duties of certain officers in connection therewith, authorizing the acceptance of bonds made by an incorporated company, providing penalties for the violation of this act, and declaring an emergency," approved March 2, 1901. Acts 1901 p. 63, §5761 Burns 1908. This section reads as follows: "Any receiver, assignee, guardian, committee, trustee, executor, administrator or other fiduciary, required by law or the order of any court or judge, to give a bond or other obligation as such, may include as a part of the lawful expense of executing his trust such reasonable sum paid a corporation authorized by law so to do, for becoming his surety on such bond or obligation as may be allowed by the court in which, or the judge before whom he is allowed or required to account, not exceeding one per cent per annum on the amount of such bond or obligation by such surety executed; *and in all actions or proceedings the party entitled to recover costs may include therein such reasonable sum as may have been paid by him to such cor-*

*poration for executing or guaranteeing any bond* or obligation therein." (Our italics.)

Counsel for appellees contend that the portion of this section italicized is invalid or void, for the reason that it violates article 4, §19, of the Constitution, it being a matter not within the scope of the title, nor properly connected with nor germane to the subject expressed in the title of the act. We are of the opinion that this contention of appellees must prevail. Said section of the state Constitution provides as follows: "Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title." A reading of the title of this act fully discloses that the subject thereof as expressed in the title is, "the incorporation of bonding or surety companies."

It is evident, we think, that, under this general subject, the provision in the body of the act, awarding to a party litigant in all actions or proceedings wherein such party is entitled to recover costs the right to recover, as a part of his costs against his adversary, the amount paid by him to such corporation as a compensation for becoming his surety on his appeal bond, or other bond or obligation given by him in such actions or proceedings, is not a matter germane to, nor within the scope of, such title, nor one which can be said to have a logical connection with the legislation thereunder. A reading of this title induces one to conclude that the various provisions of the legislation proposed will relate alone to and deal with the incorporation of bonding or surety companies, and with the powers, rights and duties of such companies and the officers thereof. A person reading the title would not expect to find in the body of the act a provision relating to or regulating the recovery of costs in actions or proceedings in court.

It will be noted that the provision in question in no manner grants any rights to the companies organized or incorporated under the statute. It does not profess to deal with nor apply to any right or duty of the surety companies, or to any of their officers, but is confined wholly to awarding litigants in all actions or proceedings wherein they are entitled to recover costs, the right to include as a part thereof the sum which they have paid to the company for becoming their surety on any bond or obligation executed in such action or proceeding.

The conclusion must follow that the provision in question relates to a subject in no manner expressed in the title, and that it can have no logical or natural connection with the subject of the legislation as expressed in the title. The following authorities fully support our conclusion: *State* v. *Young* (1874), 47 Ind. 150; *Hingle* v. *State* (1865), 24 Ind. 28; *Grubbs* v. *State* (1865), 24 Ind. 295; *Henderson* v. *London, etc., Ins. Co.* (1893), 135 Ind. 23, 41 Am. St. 410; *Mewherter* v. *Price* (1858), 11 Ind. 199; *State, ex rel.,* v. *Commercial Ins. Co.* (1902), 158 Ind. 680; *State* v. *Bowers* (1860), 14 Ind. 195; *State, ex rel.,* v. *Board, etc.* (1906), 166 Ind. 162.

For the reasons which we have herein advanced, we hold that under the title of the act in question the insertion in §5761, *supra,* of the provisions italicized was in violation of article 4, §19, of the state Constitution, and therefore said provisions are void and of no avail to appellants.

The motion to retax is sustained at appellants' cost, and the clerk of this court is ordered to strike out and eliminate said item of $1,010.93 from the costs taxed in this cause.