## MATERIAL SERVICE CORPORATION v. SCHOOL CITY OF HAMMOND, LAKE COUNTY, IND., et al.

### Nos. 7246, 7247.

Circuit Court of Appeals, Seventh Circuit.

Nov. 4, 1940.

Rehearing Denied Dec. 20, 1940.

Gerald A. Gillett and Kal Waller, both of Hammond, Ind., for defendants-appellants.

Frederick C. Crumpacker and Edwin H. Friedrich, both of Hammond, Ind., Owen W. Crumpacker, of Whiting, Ind., and Ber-

nard A. Petrie, of Hammond, Ind., for plaintiff-appellee.

Before SPARKS and TREANOR, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

In January, 1938, the E. W. Sproul Construction Company, an Illinois corporation, brought two suits in the District Court against the School City of Hammond, Indiana, and its Board of Trustees to recover balances claimed to be due under separate contracts for the erection of two school buildings, for damages and extras occasioned by delays. On October 1, 1938, the Material Service Corporation, an Illinois corporation, stepped into the shoes of Sproul by an assignment from Sproul to it of all its claims against defendant. The first case grew out of a contract for the construction of the Morton School and the second, a similar contract for the construction of the Edison School, both in the City of Hammond. Plaintiff recovered a judgment in the first case for $24,462.14, and in the second case for $25,155.32. From these judgments defendants appeal.

The two school houses were erected under separate contracts containing substantially identical provisions. The complaints and answers and special findings and conclusions of law in each case are substantially identical, and it is agreed by the parties that the cases are to be heard together and the decision in one will control the decision in the other. Sproul and its assignee will be referred to as the contractor or plaintiff, and, unless otherwise specifically indicated this opinion will refer to the Morton contract. Defendant in the trial below filed a counterclaim but the same has since been abandoned, and it is conceded that the recovery under conclusions of law 1, 2 and 5 of the District Court should stand. Conclusions of law, numbered 3 and 4, present the only questions for review. Conclusion 3 permits recovery of $11,854.86 for furnishing temporary heat during construction, for certain damages due to the failure of defendant to supply proper heat, and for damages occasioned by delay in completion of the permanent heating plant. Conclusion 4 permits recovery of $2,539.61, as damages for delay of the defendant in obtaining confirming orders from the Federal Emergency Administration of Public Works for the performance of certain optional work known as alternates "L" and "M".

The work contemplated was divided into six branches—the first was the general construction which included all work except electrical work, plumbing, heating, ventilating, and automatic temperature control. Sproul was the general contractor, and we are here concerned only with its contract and that of the heating contractor. Under its bid the general contractor submitted a figure for the building complete and also gave separate figures for certain alternate work. The alternate work was designated as alternates "A," "B," "F," "H," "L," and "M," but we shall have occasion to refer only to alternates "L" and "M," as they alone are the subject of controversy. The contractor's total bid was $414,680, which figure included the various alternates aggregating $44,065. The contract was let to Sproul for the net figure of $370,615, which covered all general construction excepting the alternates. Under the contract the board had the right within one hundred and twenty days from the day of its execution to require the contractor to construct the extra work provided by the alternates, by serving notice upon the contractor. The board did, in fact, exercise this option as to alternates "L" and "M" and notified the contractor to proceed with the construction of the work provided by alternate "L" at the bid of $15,868 and that provided for by alternate "M" at the bid of $6,495. It was the delay in gaining the approval of the Federal Emergency Administration in regard to these two alternates that brought about plaintiff's claim for damages represented by the District Court's conclusion of law 4.

### Temporary Heat, Conclusion of Law No. 3.

The permanent heating system was to be installed by the heating contractor whose contract among other things provided as follows:

"*Time.* The contract shall be sufficiently completed that temporary heat can be used, if necessary during and after plastering. The entire contract shall be completed on or before the time of completion of the building structure."

"*Temporary Connections.* The Contractor shall erect and connect all direct radiators temporarily prior to the permanent setting, as a part of the contract, without extra compensation, when so ordered by the Architect. Temporary valves shall be furnished for such temporary connections,

as the valves for permanent use may not be used for temporary setting."

"*Heating During Construction.* See general conditions."

The general specifications were for the guidance of all contractors and, so far as applicable, became part of the contract of each. Such general specifications contained the following in reference to temporary heat during construction:

"*Temporary Heat.* The permanent heating plant shall be used to furnish heating during construction, at such times as the Architect may require.

"If impractical, in the judgment of the Architect, to use the permanent heating plant, other satisfactory, approved equipment that will in no way cause damage to finished work, shall be furnished and operated by the Contractor.

"It must be fully understood that at no time shall the temperature be allowed to fall below fifty (50) degrees Fahrenheit in any portion of the building which has received the first coat of plastering.

  \*    \*    \*    \*    \*    \* "

" 'Contractor and Contractors' refers to and indicates the party or parties contracting to perform the work to be done in pursuance of this contract and these specifications."

The general specifications also contained the following provision applicable to the general contractor:

"*Protection Against Damage.* The Contractor will be held responsible for the protection of all work and materials, furnished by him, from damage and loss resulting from carelessness or other causes until the entire work is completed and accepted. Any damaged work or materials will be condemned and rejected, and shall be removed from the premises as hereinafter specified.

"The Contractor shall furnish and erect his own storage sheds, platforms, etc., for the protection of work and materials.

"All necessary precautions shall be taken to protect inflammable materials from fire at all times."

The contract also provided that the decision of the Architect as to the proper interpretation of the drawings and specifications should be final and further provided that if the Contractor should disregard the instructions of the Architect, or otherwise be guilty of a substantial violation of the Contract, the Board under direction of the Architect might terminate the employment of the Contractor, take possession of the premises, materials, tools, and appliances and finish the work by whatever method it deemed expedient.

It is from the confusion arising in the interpretation of these provisions of the heating contract and the general contract that the controversy in reference to temporary heat has arisen. On October 12, 1936, the general contractor informed the Architect by letter that he was ready to begin the plastering in the building and requested that the heating contractor be required to provide temporary heat in accordance with the provisions of the specifications entitled "Temporary Heat." The Architect replied on October 13 advising the general contractor, "I cannot agree with your interpretation of the specifications, namely that the heating contractor shall furnish the temporary heat for these projects. My decision in this matter is that it will be necessary for you to protect all work and materials covered under your contract." Thereupon, the general contractor protested this ruling to the School Board, reasserting its position and proposing arbitration. The Board replied through a letter from its attorney on October 20 that the matter was not subject to arbitration at that time and affirming the ruling of its Architect. They also advised the general contractor that "you will be held personally responsible for any loss or damage sustained to your work until said work has been completed and accepted by the Board." The contractor then pressed his position before the State Director of the Federal Emergency Administration, but he disavowed any authority in the matter. Acting under this coercion from the defendant, the general contractor installed salamanders from which temporary heat was furnished a portion of the time. During this time some of the plaster froze, and certain parts of the building were damaged by dampness and the contractor was required to and did repair the same. It is for this expense in furnishing temporary heat and repairing portions of the building damaged by failure to furnish adequate heat, for delay, etc., that the general contractor claimed damages from the defendant in the sum of $11,854.86, and covered by the District Court's conclusion of law No. 3.

A determination of whether the furnishing of temporary heat was within the contract obligation of the plaintiff or whether

it was beyond his contract is the real question in this connection, and not necessarily whether it was furnished under compulsion or duress. If it was a part of plaintiff's contract, defendant had a right to compel its performance and any insistence by defendant within the limits of legitimate persuasion could not be complained of. On the other hand, if plaintiff had not contracted to supply temporary heat, defendant had no right to insist that it do so.

The contract and specifications prepared by the agents of defendant are, as respects the furnishing of temporary heat, loosely drawn and their proper construction not free from doubt. It is urged by defendant that the provision in the specifications that the general contractor shall be held responsible for the protection of all work and materials furnished by him required him to furnish temporary heat. Viewed in the light of other provisions of the specifications, we cannot accept this construction. It is quite clear that the heating contractor was required to have his work sufficiently completed so that temporary heat could be furnished during and after plastering. He was required to connect all radiators temporarily without extra compensation when ordered by the Architect and required to use temporary connections so that the valves for permanent use would not be subjected to the usage and abuse of plastering and other construction work. Indeed, the specifications re "Temporary Heat" which are to be found in the general specifications provided that the permanent heating plant should be used to furnish heat during construction at such times as the Architect would require heat. It further provided, however, that if in the judgment of the Architect it was impracticable to use the permanent heating plant, other satisfactory equipment should be furnished and operated by the "contractor."

The question of determining the practicability of using the permanent heating plant, which was vested in the Architect by this clause, did not mean that the Architect should determine impracticability · on the basis of the non-construction of the permanent heating plant. Many reasons might have arisen why it was not practicable to use the permanent plant. Heat might have been desired for the time only in one room, in which case the Architect may have well said that it was impracticable to use the permanent system designed for heating a large building. This was a

discretion to be exercised by the Architect only after the permanent plant had become available; and the exercise of such discretion on the basis of the failure of the heating contractor to comply with his contract and install the plant would not have been justified at any time.

The more important question, however, is to determine who is meant in the clause last referred to by the word "contractor."

■ If the parties had defined their use of the word "contractor" in this connection, this controversy need not have arisen. Did they mean General Contractor or Heating Contractor? Viewed in the light of other provisions of the contract, notably that which provides that " 'contractor' or 'contractors' refers to and indicates the party or parties contracting to perform the work to be done in pursuance of this contract and these specifications" we agree with the District Court's construction that it was the duty of the heating contractor to furnish the temporary heat. The general provision concerning protection of work and materials by the general contractor cannot be held to require the furnishing of temporary heat when considered in the light of the express provisions referred to. The Architect and the defendant placed an erroneous and mistaken construction on this part of the contract. The fact basis is undisputed and a determination of the question depended entirely on a legal construction of the provisions of the contract. The parties agree that under the law of Indiana the courts are not foreclosed from making their own interpretation of the contract. McCoy v. Able, 131 Ind. 417, 30 N.E. 528, 31 N.E. 453; Louisville, etc., Ry. Co. v. Donnegan, 111 Ind. 179, 12 N.E. 153; Indianapolis, etc., Traction Co. v. Brennan, 174 Ind. 1, 87 N.E. 215, 90 N.E. 65, 68, 91 N.E. 503, 30 L.R.A.,N.S., 85. After giving to the Architect's ruling such consideration as it is entitled, we cannot accept as a matter of law his interpretation of this provision of the contract.

■ Having concluded that the contract did not require plaintiff to furnish temporary heat what do we find? Both the Architect and the defendant mistakenly assumed that plaintiff was obligated to furnish temporary heat and were insisting in no uncertain terms that it do so. Plaintiff was confronted with something of an emergency. Great damage might ensue without the building being heated, indefinite

delay would follow cessation of plastering operations with possible attendant penalties under the contract. Confronted by this situation, plaintiff proceeded to install salamanders and furnished temporary heat until the permanent heating plant could be completed to a point suitable for temporary use. It did so under protest and at all times maintaining itself free from any contractual obligation so to do. Plaintiff undoubtedly acted in the best interest of all concerned, minimizing the damages that might have followed a different course. Under such circumstances we think he is entitled to recover reasonable compensation therefor. The previous decision of this Court in Yuhasz v. United States, 7 Cir., 109 F.2d 467, relied upon by defendant is to be distinguished from the situation here present. We there said that under the contract then under consideration the plaintiff could not recover from the United States either on a quantum meruit or upon the contract unless the changes or extras were authorized by the proper officials of defendant and approved as provided by the contract. Defendant urges analogy on account of a provision in the instant contract that "no claim for additional compensation on account of extra labor or materials furnished will be entertained unless * * * furnished upon written order signed by the Architect and approved by the Owner."

Unless the letters from the Architect and the defendant hereinbefore referred to are to be construed as written orders for plaintiff to proceed with the furnishing of temporary heat, of course none were had. The Architect and the owner were at all times contending that this was already a part of plaintiff's contract and insisting that he perform. Obviously they had no intention of giving the general contractor an order for extras as provided in the building contract. If it be conceded (but not here held) that plaintiff's claim for furnishing temporary heat falls within the last mentioned clause of the contract, then we think that all the facts and circumstances here present excused performance of this condition. The general contractor accepted the situation with which it was then confronted, preferring to perform the work urged upon it by the Architect and owner, although under protest, and await a more propitious day for a determination of the question in dispute. It did not stand idly by while Rome burned, but acted as well in the interest of defendant as itself. Under such circumstances it will not be held to have waived its original protesting position and will not be penalized by the Courts for the exercise of sound judgment. We think the District Court rightly concluded that plaintiff was entitled to recover from defendant the reasonable expense in furnishing temporary heat.

The District Court included in its allowance to plaintiff the following items as set forth in finding of fact No. 6: Replacing of frozen plaster due to inadequate heat $593.30, repainting ceilings due to inadequate heat $476.28, repairing damage due to soot and smoke from the salamanders $257.40, damages due to delay of nine weeks between October 15 and December 31, 1936, attributable to failure to have permanent heating plant ready for temporary use, $1,806.84. In these respects we think the District Court was in error. The plaintiff having undertaken to furnish temporary heat, though under the conditions heretofore indicated, cannot at one and the same time recover the reasonable expense of furnishing temporary heat and also damages for failure to furnish *adequate* temporary heat. This failure was the contractor's and not the defendant's. Neither is plaintiff entitled to recover damages for any delay between October 15 and December 31, 1936, for the reason that it began furnishing heat about October 15, as appellee asserts in its brief, and such delay from that time, if any, is therefore not chargeable to defendant.

The District Court also included a general allowance of fifteen per cent of all the foregoing items amounting to $1,546.28 as overhead expense to the general contractor. Obviously, having held some of the items not recoverable, the overhead allowance must fail proportionately.

Objection is made that the findings of fact do not support conclusion of law No. 3. We have carefully examined the findings upon which this conclusion is based and believe them sufficient except in the particulars indicated.

### Alternates "L" and "M", Conclusion of Law No. 4.

Objection is made to the District Court's conclusion of law No. 4, because it permits recovery of the sum of $2,539.61 as damages sustained by plaintiff on account of delay in obtaining confirming orders from the Federal Emergency Administration (hereinafter referred to as FEA), for the installation of the work covered by

alternates "L" and "M". Pertinent provisions of the building contract between plaintiff and defendant are appended.[1]

The schools were being erected under an arrangement with the FEA for the furnishing of forty-five per cent of the funds and it will be seen that the general contractor was obliged to comply with the construction regulations issued by the FEA. It was further provided that before the contract should become effective or binding on either party it must have the approval of the FEA. This approval was duly had. The work to be done under alternates "L" and "M" and the price to be paid therefor were fully set forth in the contract. This had been approved "in its entirety" on January 7, 1936.

Under the terms of the contract, the defendant had the privilege within 120 days from its date of reinstating the work covered by alternates "L" and "M". This option the defendant exercised (not within the 120 days, but within an extension of time agreed upon); but the general contractor delayed entering upon the construction work provided for by these alternates until he had gained the specific approval of the FEA to alternates "L" and "M". This was not had until some two or three months after the option was exercised by the defendant, and it is for this delay that the plaintiff asserts liability against the defendant. Defendant contends that no further approval was required from the FEA and that the contractor should have proceeded promptly with the work.

With this construction we agree. The approval of January 7, 1936 having been had, no other approval was necessary after alternates "L" and "M" had been reinstated under the terms of the contract. The complete specifications with reference to alternates "L" and "M", the kind and character of work to be done, the price to be paid therefor, and all other details, had been covered by the building contract. Nothing further remained to be done to set the machinery in motion for construction of these alternates, except the exercise of the option by the defendant.

Upon the exercise of such option by defendant its liability to plaintiff became fixed. Upon notice thereof to plaintiff, plaintiff's obligation to proceed with the work likewise became fixed. Any controversy that might subsequently arise between defendant and the FEA was no concern of plaintiff, because FEA had long before placed its approval on the contract as a whole. We, therefore, conclude that the court's allowance under conclusion of law 4 was not justified by the facts found.

What has been said refers specifically to construction under the Morton School contract. There was in the case of the Edison School contract an additional allowance of $903.42 on account of delay from May 6 to June 6, 1937, in obtaining confirming orders for the building of twelve additional class rooms under the option referred to as Base Bid No. 1. For the reasons indicated, this allowance must also be disapproved.

The judgments of the District Court are reversed and the causes remanded for further proceedings consistent herewith. Costs of this appeal may be taxed one-half to appellants and one-half to appellee.

Reversed and remanded.

---

1 "Article V. The contractor shall comply with the Construction Regulations * * * Relating to Applicants and Projects under the Emergency Relief Appropriation Act of 1935; * * *".

"Article X. It is hereby further mutually agreed that the Owner upon its option may within a period of time not exceeding One Hundred Twenty (120) days from date of this contract reinstate the work covered by Alternates L and M * * *. In such event it shall be obligatory on the part of the Contractor to proceed with the construction of the Project hereinabove set out under the same terms and conditions agreed upon under Contractor's Base Bid No. 2. * * *"

"Article XIII. It is further understood and agreed by the parties hereto that the funds to be expended for the payment of the construction of this project will be furnished in part by the Owner and in part by Grant made by the Federal Government and neither this contract or bond referring to same shall become effective or binding on any of the parties hereto until they are approved by the Acting State Director of Indiana for the Administrator of Federal Emergency Administration of Public Works and such approval noted on said contract by said officer.

\*     \*     \*     \*     \*     \*

"The above contract is hereby approved in its entirety this ..................... day of January, 1936.        Jan. 7, 1936

"(Signed) F. M. Logan,

\*Acting State Director of Indiana for the Administrator of Federal Emergency Administration of Public Works."